**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**L. N. WHITE AND COMPANY, Inc.,**
**Defendant-Appellant.**

**No. 140, Docket 29771.**

United States Court of Appeals
Second Circuit.

Argued Nov. 5, 1965.

Decided March 10, 1966.

Dawnald R. Henderson, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., and Alan G. Blumberg, Asst. U. S. Atty., New York City, on the brief), for plaintiff-appellee.

Seymour Stone, New York City (Philip Novick, of Novick & Stone, New York City, on the brief), for defendant-appellant.

Before KAUFMAN and HAYS, Circuit Judges, and TIMBERS, District Judge.*

TIMBERS, District Judge.

L. N. White and Company, Inc., a New York corporation engaged in the export and import business and specializing in beans, appeals from a judgment entered against it in amount of $9,481.41, including interest and costs, in the United States District Court for the Southern District of New York, after a two day trial without a jury before Edward C. McLean, District Judge, in an action pursuant to 15 U.S.C. § 714b(c) brought by the United States on behalf of the Commodity Credit Corporation for breach of those provisions of a sales contract relating to payment of charges for warehouse storage of pea beans purchased by White from the CCC on May 11, 1956. On this appeal White raises these issues: (1) whether it is liable under the contract to pay "commingled" storage charges and, if so, whether 15¢ per cwt. per month was the rate in effect at the place of delivery; (2) assuming White's liability, whether the parties agreed upon an accord and satisfaction which bars appellee's recovery; and (3) whether interest was properly awarded to appellee from the date of its demand. We hold that the district court correctly decided each of these issues in favor of appellee. Accordingly, we affirm.

FACTS

A brief summary of the controlling facts as found by the district court is necessary to an analysis of the contract upon which turn the legal issues raised on this appeal.

*CCC's Role in the Pea Bean Commodity Market*

Over 80% of the world's supply of dry edible pea beans are grown in Eastern Michigan. As part of the federal farm price support program, the CCC indirectly purchases or takes over a substantial portion of the nation's pea bean crop in the following manner.[1] After the farmer grows the beans, harvests them and in the fall of the year stores them in a warehouse, he receives a negotiable warehouse receipt which he takes to the CCC and pledges as security for a loan. When the loan falls due, the farmer defaults. The CCC then takes over the warehouse receipt and the beans it represents in satisfaction of the loan, but continues to store the beans in the warehouse where the farmer originally stored them. The CCC does not sell the beans in the United States, for this would depress the market and defeat the price support program. In order to minimize its losses, however, the CCC sells the beans to exporters on the condition that they not be resold in the United States. The terms and conditions of such offers to sell are announced through bulletins issued by the CCC in advance. All contracts are expressly made subject to the provisions of such bulletins. One provision incorporated in all contracts of sale is that warehouse charges accrued after a cer-

---

* Chief Judge of the District of Connecticut, sitting by designation.

1. The contract in the instant case was entered into on May 11, 1956, involving pea beans from the 1955 crop. The total 1955 crop was approximately 5,000,000 cwt., of which the CCC on February 29, 1956 took over approximately 600,000 cwt., more than 10% of the total crop. The practices here described were those current in 1956.

tain date will be for the account of the buyer; specifically, if the buyer does not take delivery of his entire purchase within the month of sale, he must pay the additional storage charges thus incurred. The bulletins refer to this cost allocated to the buyer as "warehouse charges."

### "Identity Preserved Storage" and "Commingled Storage"

There are two types of storage of edible pea beans which are well recognized among those who deal in this commodity: "identity preserved" (IP) and "commingled." *IP storage* means that the identical beans placed in storage by the farmer are kept segregated from those of other farmers and, upon presentation of the warehouse receipt, the farmer gets back the same beans that he put in; any change or deterioration in weight or grade [2] of the beans, under IP storage, is the responsibility of the farmer, not the warehouseman. *Commingled storage,* on the other hand, means that a farmer's beans are mingled with those of other farmers and, upon presentation of the warehouse receipt specifying the net weight and grade of the beans originally placed in storage, the farmer is entitled to get back the equivalent weight and grade of beans; any change or deterioration in weight or grade, under commingled storage, is the responsibility of the warehouseman who must incur whatever expense is required to treat the beans in order to restore them to the weight and grade specified; in effect, under commingled storage, the warehouseman guarantees the return of the same quantity and quality of beans as were placed in storage. Understandably, the rates for

commingled storage are substantially greater than for IP storage. And, since pea beans in storage are affected adversely by warm weather, the rates for commingled storage increase as the season progresses, for example, from early spring, to late spring, to early summer, to late summer, thus reflecting the increased risk of deterioration and the increased cost of treating deteriorated beans so as to restore their weight and grade.[3]

During 1956, over 80% of the pea beans stored by farmers in Michigan warehouses were stored on a commingled basis.

When the CCC takes over the warehouse receipt upon the farmer's default in payment of his loan, the CCC steps into the farmer's shoes; it has the same rights and is under the same duties as the farmer. Most Michigan warehousemen are willing to continue storing on a commingled basis for the account of the CCC; and since most beans originally are stored by the farmer on a commingled basis, it is the practice of the CCC to leave them on that basis when it takes over the warehouse receipt unless the warehouseman declines to agree to it. The CCC, upon taking over the beans when the farmer defaults, enters into a written "Bean Storage Agreement" with the warehouseman setting forth the terms upon which the beans henceforth will be held for the account of the CCC. This contract, on printed Form 28, first prepared in 1951, is the standard one entered into between the CCC and all warehouses.

The storage contracts between the CCC and the four Michigan warehouses here

---

2. There are several grades of pea beans, of which CHP (Choice Hand Picked) is the best; Grade No. 1 is next; and Grade No. 2 is next—in order of inferiority. The contract here in question called for Grade No. 1 beans but provided for delivery of a better grade or an inferior grade upon appropriate adjustment of price: "CHP Grade to apply at 25¢ per cwt premium. US No. 2 Grade to apply at 25¢ per cwt discount."

3. In determining whether storage is on a commingled or IP basis, it makes no difference whether the beans are stored in sacks. Under IP storage, the beans necessarily are in sacks to preserve their identity; but beans may also be in sacks under commingled storage, depending upon the contract.

involved were on this standard form, each containing the following provision:

"Beans stored in sacks shall be deemed to be stored commingled with other beans, and the responsibility of the warehouseman with respect thereto shall be as if stored commingled unless the warehouse receipt or accompanying certificates is plainly marked in a manner satisfactory to Commodity that such beans are stored identity preserved. * * * "

The names of the four warehouses which stored the beans involved in the instant case, the dates of their basic storage contracts with the CCC and the dates of the schedules of storage rates effective in 1956 attached to the respective contracts, are set forth in the margin.[4] The monthly rates per cwt. for commingled storage specified in the Runciman, Harper and Cooperative contracts for the months of March through August of 1956 [5] under the heading "Storage" were as follows:

| March | 6¢ |
|---|---|
| April | 7¢ |
| May | 11¢ |
| June | 15¢ |
| July | 15¢ |
| August | 15¢ |

The Runciman contract also specified a rate of 4¢ per cwt. per month for identity preserved storage; but the Harper and Cooperative contracts made no provision for such storage. The Frutchey contract deleted all provisions for commingled storage; it specified 4¢ per cwt. per month for identity preserved storage. Frutchey was one of the few Michigan warehousemen who declined to store for the CCC on a commingled basis. It will be noted that the commingled storage rate increased as the season progressed, the maximum 15¢ rate being applicable during the summer months; and the identity preserved rate remained constant at 4¢ throughout the period.

### Contract Here in Litigation

It is against this background of the customs and usages of the pea bean trade —particularly those relating to warehouse storage and the rates of storage— that White entered into a contract with the CCC on May 11, 1956 to purchase 100,000 cwt. of "US No. 1 Dry Edible Pea Beans" at a price of $4.81 per cwt., shipment to be as soon as possible after receipt of payment. The contract consisted of a confirmation of sale signed by both parties which was expressly made subject to the terms and conditions of certain bulletins or announcements of the CCC, the relevant warehouse storage provisions of which are set forth in the margin.[6]

---

4.

| Warehouse | Date of Basic Storage Contract | Date of 1956 Storage Rate Schedule |
|---|---|---|
| C. H. Runciman Company | 9/18/51 | 2/15/56 |
| Harper Elevator Company | 9/19/51 | 2/14/56 |
| Cooperative Elevator Company | 9/ 1/52 | 3/ 3/56 |
| Frutchey Bean Company | 5/28/54 | 2/11/56 |

---

5. Storage rates charged by the warehousemen vary from year to year as reflected by the schedules of storage rates attached to the basic storage contracts, although the latter have remained unchanged since 1951.

6. Announcement GR-212, revised November 15, 1955, provided:

"Title and risk of loss and damage shall pass to the purchaser upon delivery and all warehouse and other charges thereafter accruing shall be for the account of the purchaser: *Provided,* That if delivery is not made within 30 days after the date of sale, the purchaser shall pay CCC for warehouse charges on the commodity not delivered, at the rate specified in the Confirmation of Sale for the period beginning on the 31st day to and including the date of delivery or, if the purchaser fails to take delivery, to and including the final date for

The confirmation of sale contained the following provision with respect to allocation of storage charges:

> "Storage stops for the account of CCC on date indicated [May 31, 1956]. * * * Any subsequent storage will be for the account of the buyer at rates in effect at place of delivery."

Place of delivery was specified in the confirmation of sale as follows:

> "Upon receipt of payment, delivery will be made FOB cars or trucks at the interior warehouse. * * *"

The upshot of these provisions in the bulletins and the confirmation of sale with respect to warehouse storage charges is that the parties to the instant contract agreed that such charges would be assumed by the CCC prior to May 31, 1956 but would be the obligation of White thereafter at rates in effect at the four warehouse interiors where delivery was to be made.

On May 31, 1956, White had not yet given shipping instructions or paid for 79,720.73 cwt. of the 100,000 cwt. covered by the contract. It took delivery of this balance from time to time during the three month period after May 31. The beans were delivered to White at the respective warehouses where they had been stored and were paid for by drafts drawn by the CCC against a letter of credit opened in its favor by White. The warehouses billed the CCC for the storage charges upon invoices stating the charges were for "storage" and at the rates indicated above (i. e. 4¢ per cwt. per month for IP storage and 15¢ per cwt. per month

for commingled storage) for periods of varying length depending upon when White took delivery of the respective lots. The CCC paid the warehouses a total of $11,440.06 for storage charges incurred after May 31, 1956 and billed White for the same on January 11, 1957 by sending an itemized invoice in amount of $11,440.06, of which White paid $5,072.42 on November 7, 1958. Appellee commenced the instant action on May 11, 1962 to recover the $6,367.64 balance, plus interest from January 11, 1957 and costs. White's answer alleged that it was liable for the storage charges in question only at the IP rate which it had paid and that the parties by virtue of that payment had agreed upon an accord and satisfaction.

With these facts in mind regarding the customs and usages of the pea bean trade and their bearing upon the provisions of the contract between the parties relating to the rates of warehouse storage, we turn to the legal issues raised.

## WHITE'S LIABILITY FOR COMMINGLED STORAGE CHARGES AT 15¢ PER CWT. RATE

■■ White does not dispute its liability under the contract for storage charges incurred after May 31, 1956. Its position is two-fold: (1) it claims here, as it did in the district court, that the only true storage charges were those at the IP rate of 4¢ per cwt., and that the charges at the commingled rate of 15¢ per cwt., to the extent of the 11¢ excess over the 4¢ rate, represented warehouse service charges which, although paid by

delivery specified in the Confirmation of Sale or any extension thereof: *Provided further*, That the purchaser shall not be responsible for such charges accruing after such 30-day period as a result of delay on the part of CCC in making delivery." (¶4(d))

"The purchaser shall pay CCC promptly, upon demand by CCC, the amount of warehouse charges which the purchaser is obligated to pay to CCC pursuant to Section 4(d) above. * *" (¶9)

Announcement CH-GR-18, issued March 1, 1956, provided:

"Title and risk of loss and damage shall pass to the purchaser upon delivery or transfer of warehouse receipts. Warehouse charges to be assumed by CCC through month of sale, except that if sale is made subsequent to the 20th of the month, CCC will assume warehouse charges through the following month." (¶2.c.)

As between GR-212 and CH-GR-18, the latter, by express provision, controls. CCC's obligation to assume warehouse charges extends "through month of sale" rather than for the first 30 days after date of sale. This explains the warehouse storage charge provision in the confirmation of sale here involved.

the CCC, are not the obligation of White under the contract; and (2) it claims here for the first time, not having raised the point in the district court, that the commingled rate of 15¢ per cwt. paid by the CCC was not the rate "in effect at place of delivery" as provided by the contract.

## Commingled Storage Charges

Of the 79,720.73 cwt. of beans held in storage for White after May 31, 1956, approximately one half was stored at the IP rate of 4¢ per cwt.: 37,255.35 cwt. with Frutchey and 1,603.65 cwt. with Runciman. White paid these storage charges. The balance of 40,861.73 cwt. was stored with Runciman, Harper and Cooperative at the commingled rate of 15¢ per cwt. White paid only 4¢ per cwt. on account of these charges, disclaiming liability for the balance of 11¢ at the commingled rate.

On the basis of the evidence adduced at the trial, we agree with the district court that the term "storage" as used in the confirmation of sale encompassed both IP storage and commingled storage. Announcements GR-212 and CH-GR-18 required the buyer [White] to pay "warehouse charges" after the end of the month of sale [May 31, 1956]. These announcements were expressly incorporated in the instant contract. The charges made by the warehouses after May 31 and paid by the CCC, being undeniably warehouse charges, clearly were the obligation of White under the contract. We find no merit in White's argument that the specific term "storage charges" in the confirmation of sale supersedes the general term "warehouse charges" in the announcements which were incorporated in the instant confirmation of sale and which are applicable to all contracts.

White argues that commingled storage, while embraced within the term "warehouse charges" as used in the announcements, is not a distinct type of storage, but is merely IP storage plus a service charge—i. e. a charge for services rendered by the warehouse in fulfillment of its guarantee that beans stored on a commingled basis will be returned in the same condition as when originally stored. Such services or processing rendered by the warehouse pursuant to its guarantee, White argues, is for the benefit of the CCC which is obligated by its contract to give the buyer a substantial price adjustment if the beans are delivered in a condition inferior to the grade specified in the contract (supra note 2); and, so the argument goes, the CCC should bear the cost of such services.

We recognize the plausibility of White's argument as a rational basis for including in the contract a provision allocating to the CCC storage charges in excess of the IP rate incurred after the month of sale. But the contract here did not so provide. It allocated full warehouse storage charges to the buyer after May 31. The rational basis for such a provision cannot be doubted; the buyer was thus permitted to defer taking delivery, but if it did so, any processing required would be for its benefit; and the longer it delayed taking delivery, the greater the likelihood that processing would be necessary.

The district court found that the term "storage charges" in the confirmation of sale was not intended to have a different meaning from the term "warehouse charges" in the announcements; that there was no ambiguity in the contract read as a whole; that the 15¢ rate was just as much a rate for storage as the 4¢ rate; and that the two different rates, each for a different type of storage, constituted the measure of White's obligation for storage under the contract, depending upon the type of storage utilized in the particular warehouse. We hold that the district court's findings not only were not clearly erroneous; they were clearly correct.

White was an experienced bean dealer. It specialized in buying and exporting beans. It had had previous dealings with the CCC in the purchase of beans for export. It is presumed to have had knowledge of the terms of the CCC's announcements with respect to the sale of beans, including the warehouse stor-

age provisions and the practice of incorporating such provisions in the confirmation of sale. It is presumed to have had knowledge of the CCC's practice of continuing storage on the same basis when it takes over the warehouse receipt as that upon which the farmer originally placed the beans in storage; and, since 80% of the beans stored in Michigan were on a commingled basis, it presumably knew that after the end of February when the CCC took over a substantial portion of the crop, most of the beans taken over by the CCC would be on a commingled basis. Having had previous dealings with the CCC in the purchase of beans for export, White presumably knew of the standard form of bean storage agreement entered into between the CCC and warehousemen which had been used during the five previous seasons—particularly the provisions that beans presumptively are stored on a commingled basis unless identity preserved storage is specified (supra p. 707) and that commingled storage rates not only are higher than the rates for identity preserved storage, but they increase as the season progresses (supra p. 707). White also presumably knew that this standard form of bean storage agreement referred to warehouse storage on a commingled basis as a storage charge, as did likewise the standard warehouse invoice—thus indicating that the terms "warehouse charges" and "storage charges" were used interchangeably in the trade.

Finally, as the district court noted, this is not a case in which the CCC changed from a less expensive to a more expensive type of storage in order to secure the warehouseman's guarantee.[7] The CCC, in continuing the original storage as determined by the farmer, was not seeking a profit on its storage charges; it was merely continuing the same protection against loss which the farmer invoked when he placed the beans in storage. Since White elected to avail itself of that type of storage beyond the date storage stopped for the account of the CCC, by the plain terms of the contract White must bear the cost of such storage and at the rates agreed upon, the net effect of which is to make the United States whole for the charges it has paid for the account of White.

*Rates in Effect at Place of Delivery*

Having sustained the district court in its holding that, in addition to the IP storage charges which White has paid, it is liable for the warehouses' commingled storage charges after May 31 paid by the CCC, we have ruled upon all the district court was asked to rule upon, except for the issues of accord and satisfaction and interest.

■ White's claim, raised on appeal for the first time, that the commingled rate of 15¢ per cwt. paid by the CCC was not the rate "in effect at place of delivery" as provided in the confirmation of sale, but rather, 6¢ per cwt. was the applicable commingled storage rate, was not raised below.[8] We therefore do not

7. Since the more expensive type of storage (commingled) was used by the farmer and continued by the CCC during 1956 for 80% of the pea beans stored in Michigan warehouses, White came out more fortunately than it might have anticipated, in receiving the benefit of the lower rate of storage (identity preserved) on approximately half the lot of beans stored after May 31.

8. The sole issue on this point raised below, by agreement of the parties, was whether the 4¢ per cwt. rate or the 15¢ per cwt. rate was the rate in effect at place of delivery. No claim was made that 6¢ per cwt. was the commingled storage rate.

The pre-trial order recited White's contention to be as follows:

"One of the issues presented by this action is whether the defendant is required to pay storage charges after May 31, 1956 at the rate of 4¢ per cwt. per month, or at the rate of 15¢ per cwt. per month."

The government's contention was recited in the pre-trial order as follows:

"According to trade custom at the places of delivery in Michigan in 1956, the monthly storage charge for beans stored on a commingled basis was 15 cents per cwt."

Among the issues to be tried, as formulated by Judge Metzner in his pre-trial

have the benefit of the trial court's opinion on the point.[9] Ordinarily we will not consider on appeal a point not raised below. United States v. Vater, 259 F.2d 667, 672 (2 Cir. 1958); cf. United States v. Indiviglio, 352 F.2d 276, 279–281 (2 Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966), and authorities cited at 279–280.

Since White objected at the trial to evidence offered by the CCC to show that it paid the warehousemen at the rate of 15¢ per cwt. for commingled storage during June, July and August, that being the rate in effect at the warehouses as the places of delivery, and such evidence was admitted by the district court to show the rates in effect at the places of delivery, we will consider the point as having been impliedly raised under the special circumstances here present.

■ White argues that the storage rate to farmers on a commingled basis was 6¢ per cwt. per month "even in June and July," while the rate charged the government for commingled storage was always higher, being fixed by storage contracts between the government and the warehouses. White then raises the question on appeal whether it is liable for storage "at the commercial rate established by the warehousing industry in Michigan [6¢ per cwt.] or at the rate established by contract between the government and the warehouseman [15¢ per cwt.]?" It seems to us, and we hold, that in the context of this case the contract provision here involved—"storage will be for the account of the buyer at rates in effect at place of delivery"— means that the commingled storage rate was that in effect between the warehouse and the CCC at the interior warehouse [10] when liability for storage charges passed from the CCC to White under the terms of the contract. In short, White is liable for commingled storage charges at 15¢ per cwt. per month, that being the rate in effect at the place of delivery in each instance.

Accepting for purposes of argument White's claim, first raised on appeal, that there was a "commercial" and a "government" commingled storage rate, we think it is abundantly clear, viewing the terms of the contract against the customs and usages of the pea bean trade, that the contracting parties intended that White would be liable for storage charges at the "government" rate after May 31, 1956, i. e. at the rate charged by the warehouses to the CCC and paid by the CCC after that date. After all, the contract White entered into with the CCC on May 11, 1956 was a government contract. It was expressly made subject to the provisions of certain government bulletins, including specifically those allocating warehouse charges to the purchaser. GR–212 referred to "all warehouse * * * charges thereafter *accruing* shall be for the account of the purchaser." [11] (Emphasis added.) CH–GR–18 referred to

order with the consent and agreement of the parties, was the following:

"Was 15¢ per cwt. or 4¢ per cwt. the customary rate for the storage of dry edible pea beans at the places of delivery in Michigan in 1956?"

9. The only question on this point raised at the trial, as stated by Judge McLean, was this: "Defendant has agreed to pay for storage subsequent to May 31, 1956 'at rates in effect at place of delivery,' *i. e.*, the respective warehouses. The *only question*, therefore, is whether the charge in excess of 4¢ was a storage charge." (Emphasis added.)

The only other reference to the propriety of the 15¢ rate (assuming White was liable for commingled storage charges) was the following statement in Judge McLean's opinion: "Defendant also appears to argue that even though the 15¢ rate was a rate for storage, nevertheless CCC owed defendant a duty to store at the cheaper rate. The court sees no basis for such an argument. There is nothing in the contract to support it."

10. The contract provision that "delivery will be made FOB cars or trucks at the *interior* warehouse" (emphasis added) relieved White of the "load-out" charge which normally is one of the warehouse charges, as reflected in the warehouse storage agreements and warehouse invoices in evidence.

11. Supra note 6.

"Warehouse charges to be *assumed* by CCC through month of sale, except that if sale is made subsequent to the 20th of the month, CCC will *assume* warehouse charges through the following month." [12] (Emphasis added.) The connotation of charges *accruing* and charges being *assumed*, in the context here used, plainly is that of warehouse charges at government rates, i. e. at the rates established in the storage contracts between the CCC and the warehouses.[13] The sole purpose of transferring storage liability from the CCC to the purchaser was to hasten the removal of the commodity already sold and to protect the CCC from additional financial assessments after passage of title and risk of loss and damage to the purchaser upon transfer of the warehouse receipt. As we have noted above, by the strictly restitutional storage clause in the contract here involved, the CCC was not seeking a profit on storage charges it paid but was merely protecting itself from loss. If White or any other purchaser wished to avail itself of storage beyond the date storage stopped for the account of the CCC, it is no more than reasonable that the purchaser should bear the full cost of such storage. And that is precisely what the contract here

provided. For the purpose of testing the validity of White's position that it should be liable at the "commercial" rather than the "government" commingled storage rate, let us assume that the CCC had paid 6¢ per cwt. to the warehouses and the storage rate to farmers was 15¢ per cwt. If the rates were thus reversed, White surely would not claim that the "rates in effect at place of delivery" were 15¢ per cwt. and pay the CCC a 9¢ per cwt. windfall. By the same token, on the facts here presented White should not be permitted a windfall of 9¢ per cwt., which would be the effect of sustaining its disclaimer of liability for the full storage charges actually paid by the CCC.

Moreover, White, as an experienced bean dealer who had had previous dealings with the CCC in the purchase of beans for export, obviously entered into the contract of May 11, 1956 with the CCC with its eyes open and knew that to the extent it left the beans in storage after May 31 it would be liable for such storage at the same rates paid by the CCC to the warehouses, since those were the rates in effect at the warehouses as the places of delivery. It of course is true that even such ambiguity as White

12. Supra note 6.

White, recognizing that ¶2.c. of CH-GR-18, if incorporated in the contract here under construction, is fatal to White's claim that the 15¢ rate for commingled storage was not the rate in effect at the place of delivery, argues strenuously that "This provision of CH-GR-18 (2c) is not applicable. * * *" We disagree. CH-GR-18 expressly provides that "Where the terms and conditions of this announcement are inconsistent with those of GR-212, revised November 15, 1955, the terms of this announcement shall prevail." And the confirmation of sale of May 11, 1956 states that "This sale is also subject to the terms and conditions of Announcement CH-GR-18. * * *"

13. The standard "CCC Bean Storage Agreement" entered into between the CCC and the warehousemen was specifically referred to in CH-GR-18 (¶2.a.(2)), the terms and conditions of which were expressly incorporated in the confirmation of sale of May 11, 1956. White's

answer (¶8) pleaded this provision of CH-GR-18:

"* * * CCC will allow buyer a credit for loading out charges at the *CCC Bean Storage Agreement rate.*" (Emphasis added.)

Furthermore, White incorporated at length among its contentions in the pre-trial order the provisions of the standard "CCC Bean Storage Agreement" entered into betwen the CCC and the warehousemen, including the following:

"The CCC over many years has entered into bean storage contracts with warehousemen to store such beans as it may purchase. In each year the storage rates are negotiated between the warehousemen and the CCC, and these rates become a part of the bean storage contracts.

"The negotiated rates for the year 1956 fixed the storage charges at 4¢ per cwt. for 'identity preserved' beans and higher rates for 'commingled' beans."

claims as to whether the "commercial" or "government" commingled storage rate applied under the instant contract could have been obviated by a relatively simple clause in the confirmation of sale requiring the purchaser to pay storage at whatever rate the government had to pay. The absence of such a clause, however, is not fatal to the government's claim to be made whole for the storage charges it has paid under the contract for the account of White who received the benefit of the more expensive storage and at rates known to White to be those in effect at the warehouses as the places of delivery. Such a clause, granted its desirability, would do no more than crystallize what we hold is the clear intent of the contracting parties as reflected in the terms of the contract considered in the context of the customs and usages of the trade.

■ Finally, while the government acknowledges its burden of proving the "rates in effect at place of delivery," once the CCC offered in evidence the contracts between the CCC and the warehousemen and the warehouse invoices to show that the CCC paid the warehousemen 15¢ per cwt. for commingled storage during June, July and August and once the district court properly admitted such evidence to show the rates in effect at the places of delivery, White had ample opportunity to come forward with other evidence, if there was any, to show a different prevailing rate in effect at the places of delivery.[14] White offered no such evidence. All else aside, this alone would be fatal to White's claim that 15¢

per cwt. was not the prevailing rate in effect at the places of delivery. For upon the record before the district court the evidence was undisputed that 15¢ per cwt. was the rate in effect at the interior warehouse for commingled storage under government contracts during June, July and August of 1956. The district court's finding to this effect, implicit in the amount of its judgment in favor of the government, is a finding of fact which cannot be set aside as clearly erroneous. It is based on uncontroverted evidence.

We hold that the district court correctly found White liable under the contract to pay commingled storage charges after May 31, 1956 at 15¢ per cwt. per month, that being the rate in effect at the places of delivery.

ACCORD AND SATISFACTION

■■ White's claim that the parties agreed upon an accord and satisfaction which bars appellee's recovery—a claim which in our view borders on the frivolous—may be disposed of summarily.

The only portion of the warehouse storage charges which has ever been in dispute between the parties is the excess over 4¢ per cwt. for storage subsequent to May 31, 1956. White has never disputed its obligation to pay the 4¢ rate on all such storage.

As a result of an exchange of correspondence between the parties following the CCC's itemized invoice in amount of $11,440.06 sent to White on January 11, 1957, there emerged a letter of November 7, 1958 from White to the CCC enclosing a check "in the amount of $5,072.42 covering storage at the rate

14. White's reliance upon generalized statements that "the commercial rate for 'commingled' beans was an average of 6¢ throughout 1956" is wholly insufficient even to raise an issue. Aside from its inapplicability to the government storage rates with which the instant contract is concerned, such evidence does not even purport specifically to establish the "rates in effect at place of delivery"; it is unrelated to the interior warehouses as the places of delivery and it is unspecific as to the months of June, July and August of 1956, the time here involved.

Indeed, as the government points out, White made no showing that any farmer in fact stored any beans during the pertinent months. And the record does establish that after February 29, 1956, the "takeover date," virtually all beans in storage were owned by the CCC; this, according to the evidence, was part of the custom and usage of the pea bean trade.

Such evidence of itself would be sufficient to ground a finding that the 15¢ per cwt. rate for commingled storage established by the CCC contracts with the warehouses was the prevailing rate in effect at the places of delivery.

of 4¢ per month for the respective months applicable to each lot." The check was not endorsed to indicate it was in full payment of the amount in dispute; nor was there anything in the letter to so indicate. The CCC immediately deposited the check for collection and wrote White on November 14, 1958 that "We are accepting the above-mentioned check only as partial payment of your indebtedness and still expect an additional remittance at an early date." [15]

White, by merely forwarding its check in payment of an amount admittedly due and not paying or offering to pay any part of the disputed sum, could not force the CCC as its creditor to an unacceptable election. There was no intention on the part of the CCC to accept the check as full payment and therefore no accord; clearly, the payment was not to the CCC's satisfaction.

We hold that the district court correctly found that the parties did not agree upon an accord and satisfaction which bars appellee's recovery.[16] 6 Corbin, Contracts § 1279, at 133–134, and § 1289, at 163–165 (1962); 6 Williston, Contracts § 1856, at 5220–5222 (1938); Purofied Down Products Corp. v. Travelers Fire Ins. Co., 278 F.2d 439, 442–443 (2 Cir. 1960); Colonial Airlines, Inc. v. Janas, 202 F.2d 914, 918–919 (2 Cir. 1953); J. F. White Engineering Corp. v. United States, 311 F.2d 410, 412–413 (10 Cir. 1962); Hammond Ford, Inc. v. Ford Motor Company, 204 F.Supp. 772, 775–777 (S.D.N.Y.1962); Champlin v. Jackson, 313 Mass. 487, 48 N.E.2d 46 (1943);

15. The fact, as found by the district court, that this letter was not received by White is irrelevant to our disposition of this issue.

16. This being a federal question case in which jurisdiction is based on an Act of Congress, 15 U.S.C. § 714b(c), specifically authorizing suit by the CCC, the district court correctly held that the substantive issue raised by White's accord and satisfaction defense should be determined by federal law, without state law restrictions as in a diversity case. Priebe & Sons v. United States, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947); United States v. Allegheny County, 322 U.S.

Hudson v. Yonkers Fruit Co., 258 N.Y. 168, 179 N.E. 373, 80 A.L.R. 1052 (1932); Buel v. Kansas City Life Ins. Co., 32 N.M. 34, 41–47, 250 P. 635, 638–640, 52 A.L.R. 367 (1926); Weidner v. Standard Life and Accident Ins. Co., 130 Wis. 10, 110 N.W. 246 (1906); Walston v. F. D. Calkins Co., 119 Iowa 150, 93 N.W. 49 (1903).

INTEREST

The judgment entered against White on March 6, 1965 was "for the sum of $6,367.64 with 6% interest from January 11, 1957," the latter being the date of the CCC's demand upon White to pay its itemized invoice in amount of $11,440.06, of which White paid $5,072.-42 on November 7, 1958. This action was commenced on May 11, 1962 to recover the $6,367.64 balance, plus interest from January 11, 1957 and costs.

Although the government demanded interest in its complaint of May 11, 1962 and reasserted its contention at the pre-trial conference as reflected in the pre-trial order of February 19, 1964, White's claim of delay in bringing this suit and its concurrent request that no interest be awarded on the judgment were raised for the first time in its brief filed in this Court on September 16, 1965. We have considered this contention and find no basis in the record to conclude that the government's delay was improperly motivated or that White was unfairly treated by the district court's award of interest from the date of the demand.

Affirmed.

174, 182–183, 64 S.Ct. 908, 88 L.Ed. 1209 (1944); Clearfield Trust Co. v. United States, 318 U.S. 363, 366–367, 63 S.Ct. 573, 87 L.Ed. 838 (1943); Cargill, Inc. v. Commodity Credit Corp., 275 F.2d 745, 751–753 (2 Cir. 1960). "In our choice of the applicable federal rule we have occasionally selected state law." Clearfield Trust Co. v. United States, supra at 367; Cargill, Inc. v. Commodity Credit Corp., supra at 752–753. And, absent a federal rule of accord and satisfaction, it is appropriate "to apply to the construction of government contracts the principles of general contract law." Priebe & Sons v. United States, supra at 411.