UNITED STATES of America, Plaintiff,

v.

**Harry BRETZLAFF, Lee Bretzlaff, Defendants.**

No. 91–3082.

United States District Court, C.D. Illinois, Springfield Division.

Oct. 14, 1994.

---

**3.** In fact, the government at this point relegates good faith to an afterthought in a footnote in its reply brief.

David H. Hoff, Asst. U.S. Atty., Urbana, IL, for plaintiff.

William L. Hatch, Champaign, IL, for defendants.

## OPINION

RICHARD MILLS, District Judge:

Posit: If a government employee assures you that you have not signed the promissory note you have just signed, are you still liable for the promissory note?

Yes.

## I.  BACKGROUND

The government has filed a motion for summary judgment. Defendant Harry Bretzlaff (Harry) has filed a response to the government's motion. This response does not respond to the government's motion. Rather the motion alleges additional facts and argues Harry should be awarded summary judgment based on two affirmative defenses. The Court will treat Harry's response to the government's motion for summary judgment as a cross-motion for summary judgment. The government has filed a response to Harry's response to its motion for summary judgment, therefore, having an opportunity to respond to Harry's claims of affirmative defenses.

In Harry's motion for summary judgment he does not dispute the facts contained in the government's motion. Accordingly, the Court will take those facts as true. Harry's motion does allege facts additional to those contained in the government's motion. The government disputes most of the additional facts alleged in Harry's motion. Because the Court finds that even taking the facts Harry alleges as true the government is entitled to summary judgment, for purposes of deciding these motions the Court will accept as true the facts asserted in Harry's motion.

### A.  The Loans

Harry and Defendant Lee Bretzlaff (Lee) are uncle and nephew respectively. In 1985 and 1986 Lee leased some of Harry's farm ground under a crop share agreement that gave each party half of the crops grown on the land leased by Lee. As a result of this lease, both Harry and Lee were eligible to receive price support loans from the Commodity Credit Corporation (CCC).[1]

In November 1985, Harry and Lee received a $42,500.50 loan from the CCC with 18,500 bushels of corn serving as security for the loan. Harry and Lee each received a check in the amount of $21,390.25. The farm storage note and security agreement signed by Harry and Lee stated that each signing party was jointly and severally liable for the entire loan amount. In November of 1986, Harry and Lee received a $31,463.82 loan from the CCC with 17,035 bushels of corn as security. Harry and Lee each received a check in the amount of $12,794.78. Again the farm storage note and security agreement signed by Harry and Lee stated that each signing party was jointly and severally liable for the entire loan amount.

When Harry applied for these loans at the Champaign County ASCS office, he stated that he wished to receive an individual loan secured by his corn. An ASCS employee assured Harry that the notes he signed obligated him to repay only those proceeds distributed directly to him.

### B.  Calling of the Loans

The grain acting as security for these notes was stored under seal in an approved storage site. In July of 1987 an ASCS employee spot checked the grain bins in which the grain securing the 1985 and 1986 notes was stored. The spot check revealed a significant shortage in the corn promised as

---

1. The Commodity Credit Corporation is a part of the United States Department of Agriculture. 15 U.S.C. § 714. The CCC's purpose is to support prices of agricultural commodities through loans, purchases, payments and other methods. *Id.* The CCC has no operating personnel. Instead, its programs are administered by the Agricultural Stabilization and Conservation Service (ASCS) which is also part of the U.S. Department of Agriculture. The ASCS is organized on three levels; county, state, and federal.

security for the CCC loans. The Champaign County ASCS office called both notes. Harry and Lee responded to the call notices by delivering the remaining corn pledged as security for the CCC loans to the Grand Prairie Coop elevator.

Harry and Lee were 11,557 bushels short of pledged corn on the 1985 loan. This shortage combined with interest, penalties and liquidated damages resulted in an unpaid loan balance of $37,570.25 on the 1985 loan. Harry and Lee were 8,562 bushels short of pledged corn on the 1986 loan. This shortage combined with interest, penalties and liquidated damages resulted in an unpaid loan balance of $18,347.81.

## C. *Amount Due on the Loans*

### 1) The Government's Position

The precise course of events after this point is not clear. Ultimately, however, these facts do not impact the Court's ruling. It is clear that the Champaign County ASCS Office erroneously divided the $37,570.25 owed on the 1985 loan into two equal claims, one for $18,785.12 for Harry and one for $18,785.13 for Lee. On May 9, 1988 Sandra Little, the Executive Director of the Champaign County, Illinois ASCS Office, sent letters to Harry and Lee informing them of these claims.

The Champaign County ASCS Office made the same mistake with the 1986 loan. The county office divided the $18,347.81 owed on the 1986 loan evenly between Harry and Lee. In January 1988, a notice was mailed to Harry and Lee informing them that Harry owed $9,173.91 on the 1986 loan and Lee owed $9,173.90. On March 2, 1988 Harry went to the Champaign County ASCS Office and paid $9,173.91, half of the amount due on the 1986 note plus $196.04 in interest. Since Harry's payment did not fully satisfy the amount owed on the 1986 note, the note was not cancelled; rather, Harry's payment was credited to the total amount due on the note.

In July 1988, personnel in the Illinois State ASCS Office discovered that the Champaign County ASCS Office had split the $35,750.25 owed on the 1985 loan and the $18,347.81 owed on the 1986 loan evenly between Harry

and Lee. The State office informed the Champaign County office that both loans were joint loans holding Harry and Lee jointly liable for the entire amounts owed. The Champaign County ASCS office corrected their mistake and amended their paper work to show Harry and Lee each liable for the entire debt owed on the two loans. On August 22, 1988 Sandra Little sent a letter to Harry and Lee informing them of this action.

It is now the government's position that Harry and Lee are jointly and severally liable for the remaining unpaid balance on the 1985 and 1986 notes. The government argues that the terms of the notes unequivocally state that Harry and Lee are jointly and severally liable for the total amount of each note. The total now claimed due is $76,-207.26.

### 2) Harry's Position

According to Harry, after receiving the Champaign County ASCS Office's letter in January 1988 stating he owed $9,173.90, he went to the ASCS Office to pay the debt. Harry informed the ASCS personnel that the shortage of pledged corn was caused by Lee's unauthorized sale of the corn. According to Harry, after the ASCS personnel discovered Lee was responsible for the shortage of corn, they recalculated Harry's debt.

The ASCS personnel credited all of the corn delivered to the Grand Prairie Coop to Harry's portion of the debt. Under this calculation method Harry was credited with delivering 8,473 bushels on the 1986 loan resulting in a shortage on Harry's part of 44.5 bushels. At a unit price of $2.14 per bushel, Harry owed $95.23 on the 1986 note. Harry was credited with delivering 3008 bushels on the 1985 loan resulting in a shortage on Harry's part of 4,274.5 bushels. At a unit price of $3.25 per bushel, Harry owed $13,892.13 on the 1985 note. Harry wrote a check for $9,173.90. $95.23 was credited to the 1986 note, paying it off (as to Harry), and the remaining $9,078.67 was credited to Harry's half of the 1985 note leaving Harry a balance of $4,813.46. In support of this claim, Harry filed a copy of a paper containing handwritten calculations in the amounts just described that he claims came from the

Champaign County ASCS Office. The paper has no markings to indicate its origin. The calculations of the 1985 debt are incorrect. The calculations on this piece of paper begin with the assumption Harry owed 7282.5 bushels on the 1985 loan. In reality Harry had pledged 9,250 bushels in support of the 1985 loan. Using this number of bushels owed, Harry owed $20,286.50 on the 1985 loan after the 3008 bushels delivered to the Grand Prairie Coop were credited to Harry's portion of the debt.

According to Harry, the next documentation he received from the ASCS was a letter on July 20, 1988 stating that $42.37 was due on the 1986 loan and $15.04 was due on the 1985 loan. Harry mailed a check to the Champaign County ASCS office in the amount of $57.41. On October 22, 1988 the ASCS set-off a $2,638.18 payment that was to be made to Harry against the balance of the 1986 loan.

## II. SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.,* 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material facts exists, the evidence is to be taken in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v.*

*Kilquist,* 833 F.2d 639 (7th Cir.1987). "A scintilla of evidence in support of the nonmovant's position is insufficient to successfully oppose summary judgment; 'there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Brownell v. Figel,* 950 F.2d 1285 (7th Cir. 1991) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)).

## III. ANALYSIS

Harry claims that he is entitled to summary judgment under two theories, accord and satisfaction and equitable estoppel. If Harry has not stated a proper affirmative defense, he has confessed to the government's Complaint. If Harry has stated a proper affirmative defense, the government cannot exercise its rights against Harry.

### A. *Accord and Satisfaction*

■ The Court will first address Harry's accord and satisfaction argument. Harry argues that the Champaign County ASCS Office's acceptance of his payments on the loans acts as an accord and satisfaction of both notes. Federal Rule of Civil Procedure 8(c) lists accord and satisfaction as an affirmative defense which must be pled. In Harry's answer to the government's Complaint, he raises two affirmative defenses, neither of which is the defense of accord and satisfaction. "Failure to plead an affirmative defense results in a waiver of that defense." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 235 (7th Cir.1991) (citations omitted). By failing to plead accord and satisfaction as an affirmative defense Harry has waived his right to assert accord and satisfaction as a defense to the government's Complaint.

Even if Harry had not waived his accord and satisfaction defense he has failed to adequately state and support the defense. The standards for stating a proper defense of accord and satisfaction applicable to this case are defined by Illinois law. *United States v. L.N. White and Co.,* 359 F.2d 703, 714 n. 16 (2nd Cir.1966) (suit by CCC governed by federal law; however, in absence of federal

rule of accord and satisfaction, applicable state law should be used).

"An 'accord and satisfaction' is an agreement between parties which settles a bona fide dispute over an unliquidated sum." *Polin v. Major,* 150 Ill.App.3d 854, 855, 502 N.E.2d 355, 356, 104 Ill.Dec. 92, 93 (Ill.App. Ct.1986) (citations omitted).

> To constitute an accord and satisfaction there must be an honest dispute between the parties, a tender with the explicit understanding of both parties that it was in full payment of all demands, and an acceptance by the creditor with the understanding that the tender is accepted in full payment.

*Id.*

■ Initially, at the time Harry made his payments to the Champaign County ASCS Office there was no honest dispute between the parties as to the amount owed by Harry. Furthermore, there was no tender of payment with the explicit understanding of both parties that it was in full payment of all demands. By Harry's own admission after he made the $9,173.90 payment he still owed $4,813.46. The only other payment Harry made to the CCC was in the amount of $57.41. By Harry's own calculations, therefore, he still owed $4,756.05.

## B. *Equitable Estoppel*

Harry's remaining defense argued in his motion for summary judgment is equitable estoppel. Like accord and satisfaction, the defense of estoppel is listed in Rule 8(c) as an affirmative defense that must be pled. Whether Harry has met this requirement is questionable.

In Harry's Answer he raises the following affirmative defense:

> 1. At all times relevant hereto, the relationship between defendants was that of Harry Bretzlaff, as landlord, and Lee Bretzlaff, as tenant.
>
> 2. Each defendant owned his grain separately, and they did not market their grain together or otherwise do business together.

> 3. The proceeds of the subject loans were received in separate shares by each defendant.
>
> 4. The subject loans should not have been processed as joint loans, but as separate loans with each defendant being liable for his half of the proceeds.
>
> 5. Each defendant was told by plaintiff that he was only liable for his half of the loans.

The question is whether this affirmative defense adequately put the government on notice that Harry would assert the affirmative defense of equitable estoppel. *Bank Leumi,* 928 F.2d at 235 ("purpose of Rule 8(c) is to give plaintiff adequate notice prior to trial of the defenses that the defendant intends to assert.") (citations omitted). While not a model of clarity, the Court is satisfied that this affirmative defense was sufficient to appraise the government that Harry could assert an estoppel defense.

While generally a party cannot assert equitable estoppel as a defense against the United States, the Seventh Circuit has held that in certain narrow circumstances the government can be estopped. *Portmann v. United States,* 674 F.2d 1155 (7th Cir.1982). In *Portmann,* the plaintiff express mailed three packages from Illinois to New York via the U.S. Post Office. The plaintiff had been assured by a postal worker that her packages were insured up to $50,000. One of the packages was not delivered and the plaintiff filed a claim with the Post Office for $3,874, the value of the contents of that package.

The Post Office denied the plaintiff's claim after finding that under its regulations the plaintiff's packages contained "merchandise" which was only insurable up to $500. The $50,000 coverage referred to by the postal worker only applied to "documents."

The Plaintiff sued the Post Office claiming that the contents of her package were documents as defined by the postal regulations or alternatively the Post Office was equitably estopped from denying her $50,000 coverage. The district court granted summary judgment in favor of the Post Office, holding that Plaintiff's package contained merchandise and that as a matter of law the doctrine of equitable estoppel did not apply to the gov-

ernment. The Seventh Circuit affirmed the district court's finding that the plaintiff's package did not contain documents as that word was defined by the postal regulations, but reversed the district court's finding that as a matter of law equitable estoppel could not be asserted against the government.

The *Portmann* court held that equitable estoppel could apply to the government if five requirements were met.

First, the party to be estopped must know the facts. Second, this party must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has a right to believe it is so intended. Third, the party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct to his substantial injury.

*Portmann*, 674 F.2d at 1167 (quoting *TRW, Inc. v. Federal Trade Com.*, 647 F.2d 942 (9th Cir.1981). The fifth requirement established in *Portmann*, which was also taken from *TRW*, is that the action relied upon to assert estoppel amounts to affirmative misconduct. The *TRW* court defined affirmative misconduct as "something more than mere negligence." *TRW* 647 F.2d at 951. The Seventh Circuit remanded the case to the district court for a determination of whether the facts warranted estopping the Post Office under the newly established test.

■ In the present case, Harry meets the first three requirements for estopping the government. First, the government knew the facts. Second, the government knew that its conduct would be relied upon by Harry. Third, Harry was ignorant of the facts. Harry cannot, however, satisfy the fourth requirement, reasonable reliance.

"In deciding questions of estoppel the reasonableness of the reliance by the party asserting estoppel is the central inquiry." *Woodstock/Kenosha Health Center v. Schweiker*, 713 F.2d 285, 290 (7th Cir.1983) (citations omitted). While there is no doubt that Harry relied on the county ASCS personnel's assurances that the note he was signing only bound him to his half of the loan, this reliance was not reasonable.

Both notes signed by Harry contained the following language on the front page of the note.

1. **Producer's Agreement.** On or before the maturity date of this note (the maturity date shown above) or upon such earlier date as CCC may make written demand for payment, for value received, the undersigned producer(s) (hereinafter referred to as the "producer") jointly and severally promise(s) to pay to the order of CCC, at the office of the county ASC committee shown below, either the "Note Amount" shown above, ... or, in lieu thereof, the amount necessary to satisfy his/her obligations as provided in Section 6 [the 1986 note references Section 4 rather than 6] of this instrument.

Section 6(e) of the 1985 note and section 4(e) of the 1986 note state "Joint Loans. In the case of joint loans, the personal liability for the amounts specified in this section shall be joint and several on the part of each producer signing the note."

It is hard to imagine a more clear statement *informing* Harry and Lee that they were each liable for the entire amount of the notes they signed. In addition to this clear statement, section 6(a) of the 1985 note and section 4(a) of the 1986 note state that the note is subject to the provisions of the Program Regulations. One such provision, found at 7 CFR Ch. XIV § 1421.3(d) (1985 and 1986) states:

(d) Joint loans. Two or more eligible producers may obtain a joint loan on an eligible commodity produced by them if stored in the same farm storage facility except that in lieu of obtaining a joint loan, a producer may obtain an individual loan on his or her separate share of the commodity if the other producers who stored a portion of the commodity in the facility execute a Form CCC-665 stating, in part, that they are aware that a portion of the commodity in the storage facility will be under loan and that they will obtain permission from the county officer, prior to removing any commodity from the facility ... Each producer who is a party to a joint loan will be jointly and severally liable for the breach of the obligations set

forth in the loan documents and in the regulations applicable to the price support program for the commodity on which the loan was made.

This portion of the Program Regulations, although not contained directly in the note, was available to Harry if he requested it. This statement should have made clear to Harry that the note he was signing made him jointly and severally liable with Lee for the entire loan amount.

Even if someone at the county ASCS office told Harry he would be liable only for his half of the loans, Harry's estoppel argument fails. It was incumbent on Harry to read the note he was signing and inquire into whether or not the ASCS employee's representations were accurate. The notes Harry signed unambiguously stated that they were joint loans. Combined, the two loans totaled $74,253.82. A reasonable person faced with the possibility of being liable for $74,253.82 rather than $37,126.91 would have required more assurances than Harry sought in this case. As the Seventh Circuit stated in *Woodstock/Kenosha*, "[a]ctual or constructive knowledge of the true state of affairs will defeat the reasonableness of the reliance." 713 F.2d at 290.

The only post-*Portmann* case in which the Seventh Circuit applied equitable estoppel against the government is *Azar v. United States Postal Service*, 777 F.2d 1265 (7th Cir.1985). *Azar* was almost identical to *Portmann* factually. In *Azar*, the plaintiff express mailed a package from Indiana to Texas. Before mailing the package the plaintiff asked the postal worker assisting him about insurance on his package. The postal worker assured the plaintiff that the package was insured up to $50,000. The plaintiff pressed the postal worker asking if he was certain the package would be insured for $50,000. The postal worker checked with a co-worker and again assured the plaintiff that the package would be insured up to $50,000. When the plaintiff paid for the delivery, he signed a delivery agreement which contained fine print detailing the terms of the agreement. In the fine print was a statement that "merchandise" was only insurable up to $500. The contents of the plaintiff's package consti-

tuted merchandise under the applicable definition. The district court found that the plaintiff did not have his glasses with him at the time he signed the agreement and without the glasses the plaintiff was unable to read any of the fine print contained in the delivery agreement.

The package was lost and the plaintiff filed a claim for $7,500. The postal service issued a check to the plaintiff for $500 and denied any further liability. The district court and the court of appeals found that under these facts, the post office was equitably estopped from denying the plaintiff full coverage for his lost item. In the Seventh Circuit's opinion they stated that "a party's failure to discover the true facts may be *one* factor, and in some cases the key factor, in the determination of reasonableness." *Id.* at 1270 (emphasis in original). Due to the plaintiff's inability to read the details of the delivery agreement, the court determined that the plaintiff's failure to discover the true facts was excusable.

In the instant case Harry has no excuse for failing to discover the true facts. Harry was not suffering from any handicap which prevented him from reading the two notes that he signed. Without any such handicap, there is no way around the fact that Harry had constructive knowledge, provided by the face of the notes he signed, of the true state of affairs.

In *Strauch v. United States*, 637 F.2d 477 (7th Cir.1980), the plaintiff tripped and fell while walking from a post office to an adjacent parking lot. At the time of the fall, the plaintiff was walking on a public sidewalk owned by the City of Chicago. A postal inspector who investigated plaintiff's accident stated that in his opinion the post office was liable for plaintiff's injuries. Plaintiff sued the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671. The district court held that the City of Chicago, not the post office, was responsible for the condition of the sidewalk. The post office, therefore, was not liable for the plaintiff's injuries. The plaintiff argued that the post office should be estopped from denying liability based on the postal inspector's statements. According to the plaintiff's lawyer, based on the inspec-

tor's statements, he did not file suit against the City of Chicago, thereby detrimentally relying on the postal inspector's statements.

The district court held that this reliance was not reasonable, stating:

> [a]s noted above, the law in Illinois holding it the duty of a municipality, and not a property owner or lessee, to maintain sidewalks in safe condition is well settled and the exceptions to it few. An attorney has easy access to the state of the law, as well as a duty to a client to assess it thoroughly, and an attorney is far more able to evaluate potential liability than an employee of the postal service who investigates accidents. As the affidavit of Robert Marzullo, Deputy Commissioner of the Bureau of Streets for the City of Chicago, demonstrates, the fact that the sidewalk in front of the Edgebrook Postal Station and parking lot is now, and was on April 8, 1976, a part of the public way and owned and maintained by the City of Chicago, was readily ascertainable by plaintiff's attorney using reasonable diligence. As a matter of law, defendant United States cannot be estopped from denying liability for the subject injury by the alleged words of Investigator Ryan.

Similarly, in this case as a matter of law, Plaintiff United States cannot be estopped from holding Harry to the terms of the notes he signed by any statements made by Champaign County ASCS personnel. The fact that Harry was signing a joint loan, making him liable for the entire amount of the loan, was readily apparent *on the face of both notes.* One need not be an attorney to know that if you sign a contract which states you are liable for $74,253.82, you are liable for $74,253.82.

Since the Court has determined Harry failed to establish reasonable reliance, it is unnecessary to determine if the actions of the Champaign County ASCS personnel rose to the level of affirmative misconduct. *Pratte v. N.L.R.B.*, 683 F.2d 1038, 1043 (7th Cir.1982) (if reasonable reliance is not proven there is no reason to reach the question of affirmative misconduct).

## IV. CONCLUSION

The Court finds that even taking the facts alleged by Harry as true, as a matter of law Harry cannot estop the government from holding him liable for the entire amounts of the notes he signed.

*Ergo,* Plaintiff's motion for summary judgment (d/e 40) is ALLOWED.

Plaintiff is awarded summary judgment jointly and severally against Defendant Harry Bretzlaff and Defendant Lee Bretzlaff in the amount of $76,207.26 plus interest accruing after August 1, 1994 and costs of suit.

Defendant Harry Bretzlaff's motion for summary judgment (d/e 41) is DENIED.