William C. Hecht, Jr., J.
Intra Bank, S. A. (“Intra Beirut”), a banking corporation organized under the laws of the Republic of Lebanon, was licensed to maintain a branch in New York City (“Intra NY”). On October 15, 1966, the Superintendent of Banks took possession of the business and property of Intra NY and determined to liquidate its affairs, pursuant to section 606 of the Banking Law.
The time for filing claims expired on July 20, 1967. The Superintendent allowed claims aggregating $913,656. He rejected the following claims:
United States, on behalf of 'Commodity Credit Corporation (“ CCC ”) ........................... $21,010,766
Claims involved in actions pursuant to Banking Law, § 625................................... 5,850,918
$26,861,684
The Superintendent has available quick assets of $1,532,810, which are subject to the expenses of administration. The other assets include (a) the building at 680 Fifth Avenue, presently subject to a sale on sealed bids authorized by this court, on which the anticipated net realization is approximately $3,500,000; and (b) causes of action against various banks, as to which no estimate of anticipated realization is made.
The Superintendent has submitted for approval a proposed Agreement of Compromise with the United States, pursuant to section 618 (subd. 1) of the Banking Law. This provides, in substance, that the Superintendent
(a) accepts CCC’s claim as valid;
(b) will pay in full, with maximum statutory interest, all other valid claims against Intra NY (and all costs of administration and liquidation) before making payment on account of COC’s claim;
(c) will assign to the United States all his rights in the causes of action held by him.
The Superintendent has been advised and believes that, if the agreement is approved, he will be able to pay all other valid claims in full with maximum statutory interest, with a balance remaining to be paid to the United States. Moreover, the latter will assume all of the costs and other burdens of the many pending litigations. If the CCC claim be upheld as valid, and if it be found entitled to the statutory priority, there will be nothing left for payment to other creditors.
*995 The original priority statute was enacted in March, 1797 (and was subsequently known as U. S. Rev. Stat., § 3466). It is now embodied in the U. S. Code (tit. 31, § 191) and applies in all cases of insolvency. So far as is material here, it provides: ‘ ‘ Whenever any person indebted to the United States is insolvent * * * the debts due to the United States shall be first satisfied ”.
“ [CCC] shall have all the rights, privileges, and immunities of the United States with respect to the right to priority of payment with respect to debts due from insolvent, deceased, or bankrupt debtors. The Corporation may assert such rights, privileges, and immunities in any suit, action or proceeding ’ ’ (U. S. Code, tit. 15, § 714b, subd. [e]).
The Superintendent recommends approval of the compromise. Notice thereof was given to all those involved in the Superintendent’s pending litigations, to all persons whose claims were rejected, and to Intra Beirut. A hearing was held on March 27.
The settlement is opposed by Intra Beirut and by Chase Manhattan Bank. Both contend that CCC’s claim is not valid, and that if it is invalidated, there will be a surplus after payment to New York creditors. In that event, Intra Beirut points out that its stockholders would be entitled to the surplus (Banking Law, § 606, subd. 4, par. [b]); Chase argues (a) that the Superintendent would be precluded from pursuing his actions against it to recover funds claimed to be due to Intra NY; (b) its right to set off balances held by it in New York against debts owed to it in Beirut would be advantaged.
The duty of a court in passing upon proposed compromises in an insolvency proceeding was recently summarized by White, J., in Protective Committee v. Anderson (390 U. S. 414, 424): “ Compromises are ‘ a normal part of the process of reorganization ’ Case v. Los Angeles Lumber Prods. Co., 308 U. S. 106, 130 (1939). In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. At the same time, however, it is essential that every important determination in reorganization proceedings receive the ‘ informed, independent judgment ’ of the bankruptcy court. National Surety Co. v. Coriell, 289 U. S. 426, 436 * * * There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate *996 of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.”
In Shielcrawt v. Moffett (59 N. Y. S. 2d 619, 621), Botien, J., said: “In weighing the benefits held forth by the agreement of settlement against benefits dependent on the likelihood of recovery upon the plaintiffs’ cause of action, the courts cannot be expected to balance the scales with the nicety of an apothecary. The very object of a compromise ‘ is to avoid the determination of sharply contested and dubious issues ’ In re Prudence Co., 2 Cir., 98 F. 2d 559, 560, certiorari denied 306 U. S. 636 * * * However, the facts and the law must be considered carefully and fully, to the end that a true appraisal be made of the plaintiffs’ chances of success upon the issues presented, and a correlative conclusion drawn as to the fairness and reasonableness of the proposed compromise.”
(See, to the same effect, Zenn v. Anzalone, 17 Misc 2d 897 [MgCovern, J.].)
The court ‘ ‘ has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated * # * to the end that a true appraisal be made of [CCC’s] chances of success upon the issues presented, and a correlative conclusion drawn as to the fairness and reasonableness of the proposed compromise.”
OCC was created ‘ ‘ for the purpose of stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities * * * and of facilitating the orderly distribution of agricultural commodities ” (U. S. Code, tit. 15, § 714). “ [CCC] is an 6 agency and instrumentality of the United States, within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture. ’ It was created by Congress to support farm prices and to assist in maintaining and distributing adequate supplies of agricultural commodities. Its capital was provided by congressional appropriation. Any impairment of this capital, which at times has been great due to the nature of its activities, is replaced out of the public treasury; any gains are returned to that treasury” (Rainwater v. United States, 356 U. S. 590, 591-592 [footnotes omitted]).
*997 In the fulfillment of its purposes, CCC was authorized only (so far as is here material) to
“ (a) Support the prices of agricultural commodities through loans, purchases, payments, and other operations; * * *
“ (d) Remove and dispose of or aid in the removal or disposition of surplus agricultural commodities; * * °
“(f) Export or cause to be exported, or aid in the development of foreign markets for, agricultural commodities; * ÍJP *
“In the Corporation’s purchasing and selling operations with respect to agricultural commodities * * * the Corporation shall, to the maximum extent practicable consistent with the fulfillment of the Corporation’s purposes and the effective and efficient conduct of its business, utilize the usual and customary channels, facilities, and arrangements of trade and commerce ” (U. S. Code, tit. 15, § 714c).
In the furtherance of such purpose CCC “may make such loans and advances of its funds as are necessary in the conduct of its business ” (§ 714b, snbd. [1]).
The credit regulations issued by the Secretary of Agriculture under the authority of the foregoing statutes (GMS 3) limit the authority of CCC’s General Sales Manager to issue letters of credit for periods longer than 6 or 12 months. This section of the regulations reads:
“ § 1488.3 (c) Criteria for approving longer credit periods: Credit periods beyond 6 or 12 months but not beyond 36 months may be granted by the General Sales Manager in eases where extension of credit will achieve one or more of the following results:
“ (1) Permit IT. S. exporters to meet credit terms offered by competitors from other Free World countries.
“ (2) Prevent a loss or decline in established IT. S. commercial export sales caused by non commercial factors.
“ (3) Permit IT. S. exporters to establish or retain IT. S. markets in the face of penetration by Communist suppliers.
“ (4) Substitute commercial dollar sales for sales for local currencies and barter transactions.
“ (5) Result in a new use of the imported agricultural commodities in the importing country.
“ (6) Permit expanded consumption of agricultural commodities in an importing country and thereby increase total commercial sales of agricultural commodities to the importing country by the IT. S. and other exporting countries.
: ‘ In considering applications involving export of commodities to eligible countries in a good financial and balance of payments *998 situation, principal reliance will be placed upon subparagraphs (1), (2), and (3) of this paragraph.” (Code of Fed. Reg., tit. 7, § 1488.3.)
Another section of the regulations reads as follows: “ § 1488.8 Advance payment. If the exporter receives payment, in whole or in part, from or on behalf of the foreign importer of the principal value of the commodities exported under the credit arrangement prior to maturity of the credit period, he shall remit promptly to CCC such payment received plus interest for the actual credit period utilized.” (Code of Fed. Reg., tit. 7, § 1488.8.)
The claim of CCC herein is based upon 53 irrevocable letters of credit issued by Intra NY, in the aggregate amount of $21,010,766, in purported compliance with Begulation Q-MS 3. The affidavit of the Superintendent describes in detail one such transaction. Examination of the documents submitted by the Superintendent satisfies me that this transaction is fairly representative of 51 of the 53 letters. (The records regarding the remaining two, in the aggregate amount of approximately $200,000, are not available.)
The facts, stated chronologically, are :
1. On December 7, 1965, Archer Daniels Midland Company (“ADM”), an American exporter, submitted the following application to the General Sales Manager: ‘ ‘ Subject terms and conditions GSM 3 we hereby make application for credit in amount of 3 million dollars for wheat, approximately 1,900,000 bushels, all qualities, for shipment from Gulf and Eastern ports to Lebanon for payment in thirty-six months plus interest. Pay- . ment will be assured by an irrevocable letter of credit issued by a qualified United States bank in the amount of the purchase price plus interest.”
2. The General Sales Manager replied on December 14:
“ Your application dated December 7, 1965 for a CCC credit arrangement of 36 months covering approximately $3,000,000 worth of wheat for export to Lebanon is approved.
“ This approval is subject to the submission to the applicable ASCS Commodity Office of an acceptable assurance of payment from a bank in the United States. A standby type of letter of credit will be acceptable. Purchase of wheat from CCC is to be made within 90 days of the date of this approval. Export of private stocks must take place within 120 days of the date of this approval. For eligible transactions under this credit approval the interest rate will be 5%. .
“ Your credit approval number is GSM-8108.”
*999 3. On January 18, 1966, a Lebanese miller authorized Intra NY to designate ADM as the exporter of certain wheat ‘ ‘ covered by letters of credit in your possession received from US Banks or to be received later.”
4. On January 20, a Lebanese bank opened an irrevocable letter of credit, confirmed by Chase Manhattan, for the account of the Lebanese miller in favor of Intra NY.
5. On January 21, Intra NY sent ADM a copy of the letter of credit, and advised ADM that, if it supplied the proper documents required in the letters of credit, Intra NY would (a) “ establish our letter of credit in favor of CCC for the amount indicated by you, plus 5% interest per annum; and (b) remit to you the amount representing your cost of handling and freight.”
6. On March 9, Intra NY notified ADM that the letter of credit should read 11 for a period of three years from the date of issuance.”
7. On March 29, ADM supplied the requisite documents to Intra NY, including invoices totaling $1,530,979.78, for wheat shipped to Lebanese millers (including the miller specified in items 3 and 4, supra), stating u this shipment was made under CCC Credit Approval GSM-3108.” This letter directed that distribution be made by Intra NY by issuing its letter of credit in favor of CCC for $1,236,216.84, and its check to ADM covering freight and handling charges for $294,762.94, making up the foregoing total of $1,530,979.78.
8. On March 31, the full amount of the foregoing invoices was then drawn down by the American confirming banks under the letters of credit upon the Lebanese issuing banks. On the same day, the $1,530,979.78 was credited to the account of Intra NY in the American banks, and Intra NY credited the account of Intra Beirut on its books in the sum of $1,207,783.85, derived as follows:
Received under letters of credit.................$1,530,979.78
Less payments to ADM for handling and freight.. 294,762.94
Balance ...................................... $1,236,216.84
Less Commission to Intra NY.................. 28,432.99
Net Balance.............................. $1,207,783.85
9. On April 4, Intra Beirut wrote to Intra NY authorizing the latter to establish its irrevocable credit in favor of CCC, on account of ADM, in the amount of $1,236,216.84.
*1000 10. On the same day, Intra NY issued its irrevocable letter of credit authorizing OCC to draw on Intra NY at sight for account of ADM, up to $1,236,216.84 covering value of agricultural commodities specified. The letter provided:
“ Draft (s) drawn pursuant to this credit must be accompanied by your written statement that the amount due for the commodities plus interest was not received by you within 36 months effective from weighted average delivery date for each sale, or issuance of export commodity certificates by COO under Credit Approval No. GSM-3108 issued pursuant to Announcement No. GSM-3.
* * *
“ It is a further condition of this credit that COO will consent in writing to a reduction in the amount of this credit to the extent that GOG applies in satisfaction of the bank’s obligation hereunder any payments or credits received for the account of Archer Daniels Midland Co.
££ Draft(s) drawn under this irrevocable credit will be duly honored if presented to us on or before 38 months but not earlier than 36 months from the weighted average delivery dates, provided such drawings are further accompanied by your certificate certifying delivery dates of the commodities covered by this credit.”
11. At the close of business on March 31, 1966, after giving effect to the credit specified in Paragraph 8 above, Intra Beirut’s credit balance in its account in Intra NY was $1,749,-306.62. By-the close of business on April 11, 1966, payments directed by Intra Beirut had resulted in debits to said account in excess- of $1,800,000, and the credit balance was down to $255,251.31.
12. Intra Beirut is also insolvent. COO filed the same claim in the Lebanese insolvency proceeding, and was allotted proportionate shares of stock in a new company organized by the creditors. It agreed to return such aliquot part of these shares as applied to any recovery it might obtain from Intra NY.
Objectants rely on the dictum in Massachusetts v. United States (333 U. S. 611, 626-627): " And it is at least doubtful on the [priority] statute’s wording that obligations wholly contingent for ultimate maturity and obligation upon the happening of events after insolvency can be said to fall within the reach of ‘debts due ’ as of the time of insolvency ” (footnote omitted here, but discussed intra).
They cite cases which disallowed, as contingent or nonmatured on the date of insolvency, claims against guarantors or sureties or insurers. (See, e.g., People v. Metropolitan Sur. Co. *1001 [Fleet], 205 N. Y. 135, 139-146 [judgment bond]; People v. Metropolitan Sur. Co. [H. B. Smith Co.], 211 N. Y. 107, 117 [contractor’s surety bond pursuant to 32 U. S. Stat. 811]; Matter of People [Lexington Sur. & Ind. Co.], 272 N. Y. 210, 214-215 [bail bond]; People v. Commercial Alliance Life Ins. Co., 154 N. Y. 95, 98-101 [yearly renewable term life insurance policy]; Frost v. Carter, 1 Johns. Cas. 73 [indorser of promissory note].) They also cite eases disallowing claims of lessors for rent occurring after date of insolvency. (See, e.g., Varick Spring Corp. v. Bank of United States, 264 N. Y. 297, 301-303; Ruppert Realty Corp. v. Bank of United States, 156 Misc. 93, 100-101.) Their contention is that the foregoing claims are analogous to the claim of CCC against Intra NY.
There are two answers to this contention.
First, the claim of CCC is*an obligation which was fixed and had matured on the date when the order of liquidation was entered. Secondly, even if the letters of credit had not yet matured on that date the CCC claim would have to be paid, and would be entitled to priority over all other creditors, if it matures and becomes fixed in amount prior to the ultimate distribution of the assets.
1. The claim of CCC does not depend solely on its rights as holder of the letters of credit. It has a claim for restitution, based on the fact that Intra NY has procured money ‘ ‘ ‘ under such circumstances that in equity and good conscience [it] ought not to retain it ’ ” (Pink v. Title Guar, & Trust Co., 274 N. Y. 167, 173), and which Intra NY “is obliged by natural justice and equity to refund ” (Bayne v. United States, 93 U. S. 642, 643). That debt becomes subject to CCC’s statutory priority (see Bayne). CCC may sue directly on the debt, without recourse to the letters of credit. (First Nat. Bank v. Mott Iron Works, 258 U. S. 240, 241.)
The instant letters of credit do not follow the usual pattern, wherein the issuer becomes liable only if conditions are fulfilled by third parties; and may never become liable if the conditions are not performed, or if someone else pays the holder. When these letters were issued by Intra NY, it had already received full payment therefor, and all the conditions precedent to payment (furnishing of the invoices and the other documents) had been performed.
Nothing remained to be done except payment of the letters of credit by Intra NY, and by it alone. CCC could not demand payment from the Lebanese millers to whom the grain had been delivered, because they had already paid Intra NY. Nor could CCC demand payment from ADM, because it had not received *1002 the sale price from anyone, its receipt having been limited to its freight and handling charges.
Such payment was due by Intra NY to CCC immediately, since the former had already received the funds which ex cequo et bono belonged to CCC. If ADM had received money from or on behalf of the Lebanese millers prior to maturity of the credit period, it would be required to remit such payment promptly to CCC. (GMS-3, § 1488.8, supra.) No different rule applies where the money was received by Intra NY.
It would appear that CCC was not aware, when it agreed to issue these 36-month letters of credit to ADM, that Intra NY would obtain the money immediately upon shipment of the wheat. The extension of a 36-month credit under such circumstances would have been a clear violation of the above-quoted statutes and regulations. Both Intra NY and Intra Beirut were chargeable with the limitations they imposed on CCC.
In United States v. Remund (330 U. S. 539) the court held that section 3466 mandated giving priority, in a State probate proceeding, to a claim asserted by the Farm Credit Administration for unpaid emergency feed and crop loans (48 U. S. Stat. 354; 1021, 1056). The court said (p. 543): “ But it is manifest that the purpose of the Acts [authorizing feed and crop loans to farmers in drought- and storm-stricken areas of the Nation] was to give emergency relief to distressed farmers rather than to restore their credit status. ’ ’
Here it is equally manifest that the purpose of the act creating CCC and the regulations thereunder was to support the prices of agricultural commodities, not to bolster the credit of Intra NY or of Intra Beirut. It would be shocking to all concepts of justice and reason to hold that, after Intra Beirut had lost, dissipated or misappropriated these moneys, CCC was remitted to share in a prorata distribution of the assets of the insolvent Intra Beirut, to whom the moneys had been transferred without its knowledge or authority.
In Bayne v. United States (93 U. S. 642, supra) the United States issued a draft to a paymaster in the army. On the basis of that draft, he had a check of $100,000 issued to Bayne & Co. in payment of .his personal indebtedness. Bayne became insolvent. In holding that the United States was a preferred creditor for the foregoing $100,000, the court said, per Davis, J. (p. 643): “We are fully satisfied by the proofs that the transactions * * * were the result of a fraudulent purpose to secure the use of the public money to Bayne & Co., who received it with full knowledge that it belonged to the United States, and had been applied in manifest violation of the act of Congress. The law *1003 imposes on that firm an obligation, and implies a promise on its part, to refund the money to its owner. Such a promise can be enforced by action. Assumpsit tvill lie whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by natural justice and equity to refund. Moses v. Macferlan, 2 Burr. 1012. Bayne & Co. are indebted to the United States, within the meaning of [R. S. § 3466]. The form of their indebtedness, or the mode in which it was incurred, is immaterial. Lewis, Trustee v. United States, 92 U. S. 618. The government being entitled to a preference and priority of payment from the assets of its insolvent debtors, the relief in this case was, in our opinion, properly granted.” (Emphasis supplied.)
This action of assumpsit for restitution of money had and received has been embodied in our common law at least since the decision of Lord Mansfield in 1760. In that year, the Court of Kings Bench said in Moses v. Macferlan (2 Burr. 1005, 1012): “ This kind of equitable action, to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged. * * * In one word, the gist of this kind of action is, that the defendant, under the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money.”
That principle is well established in New York. As was said in Pink v. Title Guar. & Trust Co. (274 N. Y. 167, 173, supra, per Rippey, J.): “ There is no allegation in the complaint that indicates that defendant promised or intended to return the money. In the absence of such an agreement or intention, it is the obligation of defendant which plaintiff asserts and which the law creates to return the money which it procured 1 under such circumstances that in equity and good conscience [it] ought not to retain it, and which ex aequo et bono belongs to another. Duty, and not a promise or agreement or intention of the person sought to be charged, defines it.’ (Miller v. Schloss, 218 N. Y. 400, 407.) As said by this court in that case, that duty rests ‘ upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.’ Independent of any statute, form of action or legal nomenclature, the obligation to do justice rests upon all persons, natural or artificial, and the law will compel restitution from a person who obtains money or property from another fraudulently, unjustly, or without authority. (Marsh v. Fulton County, 10 Wall. [U. S.] 676, 684; Salt Lake City v. Hollister, 118 U. S. 256, 263; Louisiana v. Wood, 102 U. S. 294; Ward v. Love County, 253 U. S. 17, 24.) It is for the purpose of compelling restitution *1004 that this action is brought. (Wendt v. Fischer, 243 N. Y. 439, 444.) ”
(See, also, Chase Manhattan Bank [Nat. Assn.] v. Banque Intra, S. A., 274 F. Supp. 496, 499 [S. D. N. Y.].)
In First Nat. Bank v. Mott Iron Works (258 U. S. 240, supra) Kaiser was a subcontractor for McGhee. Kaiser assigned his contract to the bank, to whom McGhee agreed to make all payments as security for its advances.
Kaiser ordered goods from the iron company, which the latter would send only if the bank guaranteed payment. Thereupon, the bank gave the guarantee in order to enable Kaiser to complete his contract and to repay the bank’s advances. Subsequently, the bank allowed McGhee to pay directly to Kaiser moneys in excess of the claim of the iron company.
In holding the bank liable on its guarantee, the court said, per Holmes, J., (p. 241):
“ Therefore the bank is in the position of having realized the benefit to acquire which the guaranty was made, and of having realized it out of the proceeds of the goods that it induced the Iron Company to sell.
* ‘ In such circumstances, whether the contract is valid or not, the contractor is accountable to the contractee, up to the amount of his undertaking, for the proceeds coming to his hands from the contractee upon the inducement of the contract. Citizens’ Central National Bank v. Appleton, 216 U. S. 196. In this case therefore the plaintiff is entitled to recover the amount for which it has declared, and as the case was fully tried upon the merits, the distinction between a recovery on the guaranty, as having been necessarily incident to the business of banking, and a recovery of the amount received by petitioner on account of the guaranty, becomes purely formal.”
This obligation of Intra NY was not released by OCC’s acceptance of the 36-month letters of credit under the circumstances previously described. If it be contended that acceptance deferred the time of payment, immediately upon Intra NY’s insolvency, its obligation to make restitution of those funds was accelerated, and became a fixed and matured debt on that date.
In Matter of Empire State Sur. Co. (214 N. Y. 553) the court reiterated the principle in the cases cited by objectants, that claims contingent on the date of takeover could not participate in the assets of a statutory liquidation. Nevertheless it held that claims against a liability insurer were not contingent as to 11 claimants who made settlements of claims brought against them or had judgments rendered against them after the date pi the entry of the order of liquidation, although the accidents *1005 on which the assured were sued happened prior to the date of the entry of that order” (pp. 563, 570). The court said, per Seabury, J. (p. 565): “ When an accident against the consequences of which the assured is insured has happened and suit has been commenced against the assured, the insurer, under the terms of the policy, incurred the obligation of assuming the defense of such a suit. When the insurer violated the contract and refused to defend the suit or went into liquidation, thus making it impossible for it to undertake-the defense of such suit, it incurred a liability which was not contingent. * * * In such a case the liability ceased to be contingent although the amount of the liability may have been unliquidated. The insurer having failed to perform its obligation, the amount [italics by the court] of the liability would not become fixed until the loss which the assured sustained was determined, but the liability of the insurer would be certain and not contingent from the moment that it failed to perform its obligation to defend the suit brought against the assured ” (other italics supplied).
A subsequent case involving the same liquidation considered claims based on contractors’ bonds (issued pursuant to 33 U. S. Stat. 811 [ch. 778]). (216 N. Y. 273.) The court reiterated its holding in People v. Metropolitan Sur. Co. (211 N. Y. 107, supra), disallowing as contingent “ claims upon which no causes of action against the surety had accrued before the date of the entry of the order of liquidation and upon which claims no actions were commenced until after the date of the entry of the order of liquidation ” (216 N. Y., at p. 280). But it allowed, as certain and absolute at the date of entry of the order of liquidation, ‘ ‘ claims upon which causes of action had accrued and upon which actions against the surety had been commenced before * * * the date of the entry of the order of liquidation in which actions judgments on that date had not been entered” (ibid.).
Here the obligation of Intra NY to CCC to pay over the moneys received from the Lebanese millers is not embodied in an express contract. However, its quasi-contractual obligation to make restitution is equally binding, and came into play when it went into liquidation, thus making it impossible for it to per-fora.». that obligation, The instant case is even stronger than Empire State Surety, because here the amount of the liability is liquidated.
The contention that 000’s claim for restitution should be rejected because the issuance of the letters of credit by Intra NY was ultra vires has no merit. “ [A]lthough restitution of property obtained under a contract which was illegal, because *1006 ultra vires, cannot be adjudged by force of the illegal contract, yet, as the obligation to do justice rests upon all persons, natural and artificial, if one obtains the money or property of others without authority, the law, independently of express contract, will compel restitution or compensation ” (White, J., in Rankin v. Emigh, 218 U. S. 27, 35). (See, to the same effect, Citizens’ Nat. Bank v. Appleton, 216 U. S. 196, affg. 190 N. Y. 417, 420-422; Aldrich v. Chemical Nat. Bank, 176 U. S. 618; American Sur. Co. v. Philippine Nat. Bank, 245 N. Y. 116.)
2. The foregoing discussion sufficiently establishes the probability of ultimate success of COO if its claim went to trial. However, even if objectants should prevail in their contention that CCC has no claim for restitution, but is remitted to claim on its letters of credit, CCC can still show substantial probability of success if the claim will mature and become fixed in amount prior to ultimate distribution of the assets (Matter of Phillips, 196 App. Div. 175 [1st Dept.], affd. 232 N. Y. 559; United States v. Knott, 298 U. S. 544).
Matter of Phillips (supra) involved an insolvent surety company which was taken over for liquidation by the Superintendent of Insurance. The United States filed a claim upon a recognizance for the appearance of a defendant in a criminal trial in the Federal court. The defendant’s default occurred after the Superintendent’s takeover.
The Appellate Division allowed the claim as a preferred claim upon distribution, saying, per Smith, J. (196 App. Div., at pp. 176-177):
“ Such a claim would still seem to be a contingent claim as it was not even under the common law enforcible, except upon a contingency which did not happen, until after the insolvency of the casualty company. This holding, however, is not here necessary in the view I take of the rights of the government under section 3466 of the United States Revised Statutes [which] gives priority in all cases of insolvency .to any obligations due to the United States. That statute has been interpreted by the United States Supreme Court as giving priority even where claims had not matured under the rule adopted by our State. (See United States v. Fisher, 6 U. S. [2 Cranch] 358; United States v. State Bank of N. C., 31 U. S. [6 Pet.] 29; Field v. United States, 34 U. S. [9 Pet.] 182.) The right of the United States government to preference cannot be defeated by any State statute, nor by any rule adopted by the State court. (Field v. United States, 34 U. S. [9 Pet.] 182.)
“Until, therefore, the United States courts or Congress shall establish the rule as held by our State courts and the Legisla *1007 ture as to claims which have matured at the commencement of proceedings for determining the insolvency of the debtor, this court should, I think, give priority as to all claims of the United States government which have matured prior to the actual distribution of the insolvent’s property.”
The Court of Appeals answered in the affirmative the fifth certified question, as to whether section 3466 gives the United States the right to share in the assets “on a claim which is contingent at the date of .the entry of the order of liquidation but which accrues prior to the distribution of the assets ” (232 N. Y., at pp. 560-561).
In United States v. Knott (298 U. S. 544) a New Jersey surety company became insolvent, and was taken over for liquidation by that State’s Commissioner of Banking and Insurance in 1932. It had issued bail bonds to the United States in Florida. The latter’s State Treasurer took possession of the company’s securities which had been deposited with him as a condition precedent to doing business there.
The United States claimed priority upon judgments based on estreated bail bonds. A number of these judgments were entered subsequent to 1932, the date of liquidation (Record, pp. 293-296). A Florida statute provided that its courts should distribute the proceeds of the sale of the deposited securities ‘ ‘ proportionally among all of the Florida creditors who may make proof of their claims, * * * the surplus, if any, to be disposed of by proper order of such court ” (298 U. S., at p. 546). The Supreme Court held that the United States judgments were entitled to priority.
The reason for allowing priority to the claim of the United States, even though founded on a claim which is contingent on the date of insolvency, provided that it becomes fixed prior to distribution, is the strong policy underlying the priority statute.
“ The purpose of this section is 1 to secure adequate public revenues to sustain the public burden ’ (United States v. State Bank of North Carolina, 6 Pet. 29, 35), and it is to be construed liberally in order to effectuate that purpose ” (United States v. Emory, 314 U. S. 423, 426). “ Only the plainest inconsistency would warrant our finding an implied exception to the operation of so clear a command as that of § 3466 ” (ibid., p. 433).
‘ ‘ The words of § 3466 are broad and sweeping and, on their face, admit, of no exception to the priority of claims of the United States ” (United States v. Waddill Co., 323 U. S. 353, 355. See, to the same effect, Price v. United States, 269 U. S. 492, 499-500.)
*1008 It is true that, if the United States were permitted to claim only under the strict terms of the letters of credit, it could not claim its priority under Phillips and Knott unless the distribution were deferred until after the maturity date of the letters. However, under the circumstances present here, the interests of justice and fair play would dictate that such deferment he directed.
The case at bar is even stronger than Phillips and Knott. Assuming, arguendo, that the claim of the letters of credit had not accelerated on the date of the liquidation order, and had therefore not matured at that time, there is no question hut that they were indefeasible obligations which would have to be paid by Intra NY on the stated maturity date.
As already pointed out, Intra NY was the sole obligor, since payment could not be claimed from either the Lebanese millers, who had already made payment, nor from ADM, who had never received payment. Objectants emphasize the recital in the letters that CCC would consent “ to a reduction in the amount of this credit to the extent that CCC applies in satisfaction of the bank’s obligation hereunder any payments or credits received for the account of [ADM].” But it is clear that CCC would not receive payments or credits from any other source, since such payments had already been made to Intra NY.
Massachusetts v. United States (333 U. S. 611, supra) involved an assignment for the benefit of creditors. The United States claimed priority for unemployment compensation taxes due under title 9 of the Social Security Act.
That statute provided that the taxpayer might credit, against 90% of such tax, the amount of contributions paid by him into a State unemployment insurance fund (§ 902; U. S. Code, tit. 42, § 1102, now U. S. Code, tit. 26 § 3302). The assignee had exercised that option by making contributions to the Massachusetts fund. Nevertheless, the court sustained the section 3466 priority, and directed reimbursement from Massachusetts of those contributions.
In that case, the fund was not large enough to pay all the Federal claims in full. The Government apparently conceded that, if a balance remained after paying all of the claims, “ the insolvent taxpayer is nevertheless given the right by § 902 to pay that balance to the state and receive credit on his federal Title 9 tax. In such a case, it is said, the Government would be overpaid on Title 9 taxes and obligated to refund the excess. Then the taxpayer could apply the amount received in further payment of the state claim, with corresponding federal credit, overpayment and refund, only to start the cycle again and *1009 repeat it until he had paid the state its claim in full and received the entire 90 per cent credit ” (p. 624, footnote omitted).
The court pointed out that this concession would cut the ground from beneath the Government’s basic position. The court said, per Rutledge, J. (pp. 625-626):
11 Rev. Stat. § 3466 gives priority explicitly for ‘ debts due to the United States ’ and the priority given is in terms absolute, not conditional. Once attaching, it is final and conclusive [italics in original].
* m *
“But if credit can be taken after § 3466 attaches, i.e., after insolvency, effective to set aside the federal priority up to 90 per cent of the Title 9 claim, the priority to that extent becomes conditional, not absolute. Its effectiveness then becomes contingent upon the happening of subsequent events, namely, the concurrence of the conditions of § 902 for paying the state and taking the credit together with the taxpayer’s election to do this. In short, § 3466 never conclusively attached and § 902 works retroactively on occurrence of those contingencies to upset the priority.”
The court then proceeded to make the statement so heavily relied on by objectants (pp. 626-627): “ A further effect might be to make the statute applicable beyond the scope of the term * debts due to the United States.’ For if the taxpayer’s subsequent election can destroy the priority retroactively, not only the priority but the ‘ debt ’ itself becomes contingent. And it is at least doubtful on the statute’s wording that obligations wholly contingent for ultimate maturity and obligation upon the happening of events after insolvency can be said to fall within the reach of ‘ debts due ’ as of the time of insolvency.26 ”
The material portion of footnote 26 reads: ‘ ‘ But the fact that the problem has not squarely arisen in the long history of § 3466 and that all of the decisions sustaining the priority were for debts clearly due and owing, adds force to the clear inferences implicit in the statute’s wording, vis., that Congress not only created a conclusive priority attaching as of the time of insolvency but in doing so drew the line for its operation close to, if not at, the commonly accepted meaning of ‘ debt ’ as distinguished from other forms of obligation.”
The foregoing analysis shows how remote from the instant problem is the dictum in Massachusetts v. United States (supra). The holding there was that the debt due the United States under title 9 (§ 901) of the Social Security Act (U. S. Code, tit. 42, § 1101, now U. S. Code, tit. 26, § 3301) became “ final and con- *1010 elusive ” on the date of insolvency, and could not he defeated by the taxpayer’s subsequent exercise of his option under section 902. The debt due CCC here was “ final and conclusive ” on the date of insolvency if based on the theory of restitution. It was equally “ final and conclusive” on that date if based on the express contract embodied in the letters of credit, even if it be assumed arguendo that CCC might have to await payment until the stipulated maturity date. There was no possibility of defeasance of that obligation here, similar to that embodied in the Government’s concession in the cited case.
The conclusion reached herein is not in conflict with United States v. Marxen (307 U. S. 200). The United States there claimed priority in a bankruptcy proceeding on the basis of a note of the bankrupt to a bank which had been insured by the F. H. A., which the bank had assigned to the latter upon receiving reimbursement. The assignment took place after the bankruptcy petition.
In answering a certified question, the court held “ that § 3466 is inapplicable to general claims in bankruptcy transferred to the United States * # * after the filing of the petition for the reason that the rights of creditors are fixed by the Bankruptcy Act as of the filing of the petition in bankruptcy ” (p. 207).
The court emphasized the narrow rationale of its decision, saying, per Reed, J. (p. 205): “As the certificate does not show the State in which the note was executed, payable or enforceable, we are left to speculate as to the applicable law of indemnity. It is not clear that a voluntary guarantor can recover in every jurisdiction from the involuntary principal who has not requested the service. But even if we assume that such a guarantor may recover upon an implied promise of reimbursement, the rule is not effective here. The statement of the case and the question certified show that the claim in bankruptcy of the Government is based upon the note, duly assigned to it after bankruptcy. As no proof was made of any claim for reimbursement, such a claim is not involved ” (footnotes omitted).
Two other contentions made by objeetants may be briefly disposed of.
First, it is contended that the Superintendent, in his supervisory capacity, was negligent in that his examinations should have disclosed that Intra NY had issued letters of credit to CCC which were far in excess of the bank’s capital, and should have stopped this practice. There is no proof that the Superintendent’s examination did disclose or should have disclosed *1011 this fact. In any event, it is of no legal consequence. If it be assumed that the Superintendent was thus negligent in his supervisory capacity, that would not defeat the rights of the bank’s creditors for whom he is acting in a fiduciary capacity.
Secondly, it is pointed out that the Superintendent initially rejected CCC’s claim. His initial reaction is understandable, in view of the complexity of the transactions and the necessity to ferret out all the essential facts. However, the Superintendent had the right to change his mind if a complete investigation satisfied him that there was enough probable success of CCC’s claim to warrant making this settlement, which assured payment in full to other creditors who would receive nothing if CCC’s claim were ultimately adjudged valid.
The result reached herein conforms to one’s natural sense of fairness and equity. There can be little question but that, as between CCC on the one hand, and shareholders of Intra NY and creditors who claim in subordination "to them on the other hand, the claim of CCC is superior.
It may be pointed out further that, if CCC’s claim were invalidated herein on the sole ground that it had not matured on the date of the entry of the order of liquidation, it does not follow that any surplus in the Superintendent’s hands would be remitted .to Intra Beirut.
CCC, as a creditor, could bring an action in the Federal court to obtain payment from Intra NY, and could attach the latter’s assets in the Superintendent’s hands. The decision of Steuer, J., in Guaranty Trust Co. v. Bell (182 Misc. 372, cited by objeetants), holds that assets in the Superintendent’s possession cannot be attached by one creditor if thereby he would obtain preference over other creditors. It has no application to an attachment by a creditor which prevents turning assets over to shareholders.
Such an action by CCC in the Federal court would be determined by United States law, rather than by Lebanese law (Harrison v. Sterry, 5 Cranch [9 U. S.] 289, 298-299). And in such action, Federal law, rather than State law, would apply (United States v. L. N. White & Co., 359 F. 2d 703, 714, n. 16 [2d Cir.], and cases cited therein; Cargill, Inc. v. Commodity Credit Corp., 275 F. 2d 745, 751 [2d Cir.]).
Accordingly, the Superintendent’s motion for approval of the proposed compromise is granted.
(On reargument, September 16, 1968)
Intra Beirut moves for an order, pursuant to CPLK 2221, granting leave for reargument or rehearing of .the order of *1012 this court entered June 24, 1968, granting the Superintendent’s motion for an order approving the agreement of compromise between him and Commodity Credit Corporation (“CCC”). The motion is made on .the ground that the court has misapprehended and assumed facts with respect to certain matters on which it relied in granting said motion.
Movant has not given any persuasive reasons for not disclosing the facts which were known or available to it prior to the hearing on March 27, 1968, on the Superintendent’s petition for approval of the compromise. However, the Superintendent and CCC have waived any objection to this defect, on condition that the movant agrees to take any appeal from any adverse order herein within five days, and to perfect such appeal simultaneously with the appeal from the foregoing order of June 24. Movant has agreed to this condition.
Accordingly, in order to have all the facts available on appeal, the court will exercise its discretion by granting the motion for reargument and rehearing, on the express condition that movant complies with the foregoing conditions in appealing from the instant order adhering to the original determination. In the event of movant’s failure thus to expedite its appeal, the Superintendent may enter an ex parte order denying the motion for reargument and rehearing.

The Court’s Previous Determination

The court approved the Superintendent’s application on the ground that there was a sufficient showing of the probability of ultimate success, of CCC’s claim to priority of payment out of the assets of Intra NY to justify approval of the settlement, which provided for payment of all other valid claims in full out of such assets, and payment of the balance to CCC in partial liquidation of its claim. (Protective Committee v. Anderson, 390 U. S. 414; Shielcrawt v. Moffett, 59 N. Y. S. 2d 619, 621; Zenn v. Anzalone, 17 Misc 2d 897.) This conclusion was based on two independent reasons, either of which was sufficient to sustain it:
1. “ The claim of CCC does not depend on its rights as holder of the letters of credit. It has a claim for restitution, based on the fact that Intra NY has procured money ‘ “ under such circumstances that in equity and good conscience [it] ought not to retain it ” ’ (Pink v. Title Guar. & Trust Co., 274 N. Y. 167, 173), and which Intra NY ‘ is obliged by natural justice and equity to refund ’ (Bayne v. United States, 93 U. S. 642, 643). That debt, becomes subject to CCC’s statutory *1013 priority (see Bayne). CCC may sue directly on the debt, without recourse to the letters of credit (First Nat. Bank v. Mott Iron Works, 258 U. S. 240, 241).”
2. Even if CCC is remitted to claim on its letters of credit, it could still show substantial probability of success if the claim would mature and become fixed in amount prior to ultimate distribution of the assets. (Matter of Phillips, 196 App. Div. 175 [1st Dept.], affd. 232 N. Y. 559; United States v. Knott, 298 U. S. 544.)
None of the facts presented by movant affect the second reason discussed above. It alone is sufficient to justify adhering to the original decision. However, in order that this extremely complicated transaction may be fully understood, this opinion will indicate why the new facts adduced will not alter the conclusion based on the first reason set forth above.

The New Facts

1. The previous opinion of June 14, 1968 emphasized 1 ‘ that CCC was not aware, when it agreed to issue these thirty-six-month letters of credit to ADM that Intra N Y would obtain the money immediately upon shipment of the wheat ”; and that “ it would be shocking to all concepts of justice and reason to hold that, after Intra Beirut had lost, dissipated or misappropriated these moneys, CCC was remitted to share in a pro rata distribution of the assets of the insolvent Intra Beirut, to whom the money had been transferred without its knowledge or authority.”
It now appears that some representative of CCC did have full knowledge of the receipt by Intra NY of the proceeds of the grain and of the transmittal of these proceeds to Intra Beirut.
In writing an opinion, a court necessarily emphasizes all of the facts which seem pertinent. It does not follow that each one of those facts is necessary to .reach the result. In the case at bar, my conclusion would have been no different even if the facts relative to the knowledge on the part of CCC’s representatives had been disclosed on the original hearing.
The Secretary of Agriculture issued Credit Regulations QMS 3 pursuant to the authority of the statute creating CCC, and the transactions herein were all made pursuant to those regulations. One of those sections provides: “ § 1488.8 Advance payment. If the exporter receives payment, in whole or in part, from or on behalf of the foreign importer of the principal value of the commodities exported under the credit arrange *1014 ment prior to maturity of the credit period, he shall remit promptly to CCC such payment received plus interest for the actual credit period utilized.” (Code of Fed. Reg., tit. 7, § 1488.8.)
I read this section as an unequivocal mandate that, when payments were made by the importers for the grain, such payments were to be turned over promptly to CCC in reduction of the amount due to it under the letters of credit. Here, where the importers had paid for the grain in advance by the payment to Intra NY by the American banks of the letters of credit which they had guaranteed for the importers’ Lebanese banks, those amounts should have immediately been turned over to CCC when the grain was exported.
A construction of the regulation authorizing Intra NY to retain or dispose of the moneys thus deposited with it would conflict with the policy of the statute creating CCC, of preserving its capital for the purpose of stabilizing farm prices and assisting in maintaining and distributing adequate supplies of agricultural commodities. (Rainwater v. United States, 356 U. S. 590, 591-592.) See, also, opn. below (244 F. 2d 27, 30-31 [8th Cir.]) where the court said: “The Commodity Credit Corporation is actually an instrumentality of the United States ‘ within the Department of Agriculture ’. 15 U. S. C. A. § 714. Its entire original capital of $100,000,000.00 was supplied by the United States. 15 U. S. C. A. § 714e. The Secretary of the Treasury must make an annual appraisal of the net worth of Commodity Credit Corporation and if the net worth is less than $100,000,000.00 the treasury must restore the amount of capital impairment. 15 U. S. C. A. § 713a-l. If the appraisal indicates an excess, the treasury receives such excess. 15 U.S.C.A. § 713a-2. Commodity Credit Corporation is authorized to borrow up to $14,500,000,000.00 on the credit of the United States to carry out its statutory programs of making loans on agricultural commodities. 15 U. S. C. A. § 713a-4. * * * As stated by the Supreme Court in Marcus v. Hess, supra,1 these funds are as much in need of. protection from fraudulent claims as any other federal money and the statute does not make the extent of their safeguard dependent upon the bookkeeping devices used for their distribution ’. ’ ’
The United States cannot be bound by any act of its employees in conflict with that policy. (Sutton v. United States, 256 U. S. 575, 578-581; Pan American Co. v. United States, 273 U. S. 456, 501-503, 508-509; Mammoth Oil Co. v. United States, 275 U. S. 13, 34-35; Heckman v. United States, 224 U. S. 413, *1015 446.) As was said by Brandeis, J., in Sutton (supra, at pp. 579, 580):
“ The Secretary of War was, therefore, without power to make a contract binding the Government to pay more than the amount appropriated. See Bradley v. United States, 98 U. S. 104, 113, 114. Those dealing with him must be held to have had notice of the limitations upon his authority.
* * *
“ It is contended that since the contract provided that the government ‘ inspectors will keep a record of the work done,’ since their estimates were relied upon by the contractor, and since by reason of the inspector’s mistake the contractor was led to do work in excess of the appropriation, the United States is liable as upon an implied contract for the fair value of the work performed. But the short answer to this contention is that since no official of the Government could have rendered it liable for this work by an express contract, none can by his acts or omissions create a valid contract implied in fact.”
Nor can such public policy be thwarted by the application of the doctrines of estoppel, ratification or laches. (American Sur. Co. of New York v. United States, 112 F. 2d 903, 906 [10th Cir.]; Butte A. & P. Ry. Co. v. United States, 61 F. 2d 587, 590 [9th Cir.].)
Movant argues that the money paid by the importers should have been kept intact because rebates might have to be made to the importers, pursuant to the CCC policy of making the price of the grain in Lebanon competitive. It would hardly be necessary to hold the entire amount due to CCC as security because a small fraction thereof might have to be refunded to the importers. Certainly, CCC was a far better credit risk for this small amount than either the importers or Intra NY for the $20,000,000 involved here.
The importers here were represented by Lebano-American Commodity and Supply Corporation (“ LACS ”). Movant quotes a cable from the chairman of Intra Beirut, which says : “ The LACS deposit was Intra’s inducement to issue the letters and was a blocked deposit against the obligations to the CCC but the specific debits and credits were the business of LACS and Intra and were not the business of CCC.”
It is immaterial how Intra Beirut treated this deposit as an internal matter. The inescapable fact is that Intra NY had received payment for this wheat before it issued .the letters of credit to CCC.
*1016 It is worth noting, however, that Intra Beirut’s interest in this matter was not just that of a banking agent. The report of Cooper Bros., who made a worldwide audit of Intra Beirut at the request of the Minister of Finance of Lebanon, said that on April 14, 1964, an agreement was entered into between Intra Beirut and the two principals of LACS, 11 whereby profits, apparently intended to arise from the investment of the proceeds of the sale of the wheat, would be shared (after interest and expenses) equally by the three partners,” and that “advance payments on account of those profits totalling $363,320 had been made on 14th October 1966. ’ ’
Under the circumstances, while accepting the assumption of facts recited in the Government’s affidavit, I do not accept its assumption of law “ that the transmittal did not in and of itself violate applicable statutes and regulations.” The Government cannot, by a mistaken assumption or concession as to the law, direct the court to an erronous legal conclusion. (Cf. Massachusetts v. United States, 333 U. S. 611, 624 et seq.)

The Lebanese Protocol of October 11, 1967

On December 15, 1966, Intra Beirut wrote to CCC, confirming that it considered the whole amount of approximately $21,000,000 outstanding on the letters of credit, plus accrued interest, ‘ ‘ as a liability of Intra Beirut.” On the next day, CCC’s controller acknowledged this letter, and wrote: “ As stated in our discussions, I appreciate the merits of your view that in the event of Intra Bank as a whole reopening on an unrestricted basis, the C.C.C. should look to Intra Bank, Beirut and not Intra Bank, New York for the settlement of these letters of credit. Upon my return to Washington I shall endeavor to obtain the agreement of other officials of the department to this arrangement and shall so recommend to them.”
Movant relies on this as an agreement by CCC to substitute Intra Beirut as its debtor for Intra NY. It is doubtful, in the light of the cases discussed above, whether anyone in CCC would have the right to release Intra NY from its liability on the letters of credit, in consideration far the assumption of such liability by Intra Beirut. But, in any event, the short answer is that the controller’s letter made it clear that he had no such authority but would endeaver to obtain the agreement of higher officials, and that agreement was never forthcoming.
It may be added that the assumption of liability by Intra Beirut would not furnish any consideration for releasing Intra NY from its liability. Where a debtor conveys property *1017 while he is insolvent, or where the conveyance renders him insolvent, a creditor, even though his claim has not matured, could set aside the conveyance or have the court “ Make any order which the circumstances of the case may require.” (Debtor and Creditor Law, § 279.) Since the transfer of the proceeds of the New York banks’ letters of credit by Intra NY to Intra Beirut rendered the former clearly insolvent, CCC could, under the foregoing section of the Debtor and Creditor Law, have become a creditor of Intra Beirut as well as Intra NY.
It should be noted further that the approval given to ADM’s credit application was subject to the submission “of an acceptable assurance of payment from a bank in the United States ” (see Item 2 under Facts in the decision of June 14). Under the cases cited above, no representative of CCC could waive this requirement by releasing Intra NY.
By a protocol dated October 11, 1967 between the major creditors of Intra Beirut (including CCC) and Kidder, Peabody & Company a reorganization of Intra Beirut was effectuated. Bach creditor agreed to accept certain shares of common stock in the reorganized bank, in payment of its claim.
This protocol provided in paragraph 3(e): “ This Protocol does not prevent CCC from pursuing its claims under United States laws against Intra Bank assets in New York and elsewhere in the United States. CCC will initially receive common stock in proportion to its full claim. It is agreed that CCC will surrender shares to adjust for proceeds that it may receive in implementation of a Court decision in the United States. Such adjustment in shares shall result in CCC finally holding that number of shares it would have received had its original claim been equal to the total of its claim against Intra Bank reduced by the amounts collected from United States assets. Should CCC recover from Intra Bank assets in the United States a total amount in excess of its total original claim, it will pay such excess recovery to the Corporation.”
Movant submitted an affidavit by a Lebanese lawyer to the effect that by this clause “ it is clearly understood that pursuing claims under United States laws can only be done by a judicial pronouncement by a United States Court as to the verified assertion of the right of priority claimed by CCC and by no other means.” Movant argues therefore that CCC had no right to enter into the instant agreement of compromise which, so movant claims, is not “ a Court decision in the United States.”
It is unnecessary to consider what rights, if any, the other parties to the protocol may have under Lebanese law to avoid *1018 its obligations to CCC, on the ground that CCC has violated those provisions by asserting its rights against Intra NY’s assets on the basis of my decision of June 14. CCC’s right to participate in the assets of Intra NY is governed not by Lebanese law, but either by New York law or by Federal law. (See United States v. L. N. White & Co., 359 F. 2d 703, 714, n. 16 [2d Cir.] and cases cited therein; Cargill, Inc. v. Commodity Credit Corp., 275 F. 2d 745, 751 [2d Cir.].) Under either law, it is not necessary that CCC pursue its claim against Intra NY’s assets to judgment. It may receive payment of its claim in implementation of a court decision authorizing a compromise of the claim, which is just as effective for this purpose as a final adjudication would be. (Protective Committee v. Anderson, supra; Shielcrawt v. Moffett, supra; Zenn v. Anzalone, supra.)
Movant points out that the previous decision was incorrect in stating that the controversy as to who should receive the fund is “between CCC on the one hand, and shareholders of Intra NY and creditors who claim in subordination to them on the other hand. ” It is true, as pointed out, that the controversy is between CCC and the creditors of Intra Beirut rather than its shareholders, since the latter has been reorganized for the benefit of its creditors. However, creditors of Intra NY are entitled to payment out of its assets before they are turned over to Intra Beirut for payment to its creditors.
For all of the foregoing reasons, the original decision is adhered to. The motion for reargument or rehearing is granted subject to the conditions previously stated.